907 A.2d 885

Mehmet Yavuz CORAPCIOGLU

v.

Sharon ROOSEVELT.

No. 1313, Sept. Term, 2005.

Court of Special Appeals of Maryland.

Sept. 20, 2006.

574

578

Barbara E. Palmer (Lisa M. Voso, Joseph, Greenwald & Laake, P.A. on the brief), Greenbelt, for Appellant.

Alice Pare–Johnson, Germantown, for Appellee.

Panel: DAVIS, DEBORAH S. EYLER, SHARER, JJ.

DEBORAH S. EYLER, Judge.

When Darren Yavuz Corapcioglu was 2½ years old, his father, Mehmet Yavuz Corapcioglu, Ph.D. ("Father"), abducted him and took him to Turkey. At the time, there was a custody case pending over Darren, in the Circuit Court for Montgomery County, brought by his mother, Sharon Roosevelt, Ph.D. ("Mother"), with whom Darren always had lived. After more than two years of Hague Convention litigation, the Supreme Court of Turkey ordered Darren returned to Mother's custody, and they were reunited.

At issue in this appeal is a judgment entered on an award by the circuit court to Mother of $252,930 for fees and costs she incurred in securing Darren's return to the United States. Father challenges that award, raising the following questions for review, which we have reordered and reworded:

I. Did the circuit court err by treating Mother's motion for child support as a motion for counsel fees and costs under Md.Code (1984, 2004 Repl.Vol.), section 12–103 of the Family Law Article ("FL")?

II. Is the circuit court's $252,930 judgment of July 28, 2005 void because the proceedings were subject to the automatic stay in bankruptcy?

III. Did the hearing judge err by not recusing himself?

IV. Did the parties' custody agreement, as embodied in a Consent Order entered on July 20, 2004, preclude Mother from pursuing counsel fees and costs?

V. Did the circuit court's January 30, 2004 award of $200,000 for "costs" bar Mother from recovering the entire $252,930 in fees and costs she was awarded as a judgment on July 28, 2005?

VI. Did the circuit court improperly calculate Mother's fees and costs and improperly award her fees and costs that had been paid by her husband with no repayment obligation on her part?

Mother has noted a cross-appeal, raising the following question, which we also have reworded:

I. Did the circuit court err by classifying its July 28, 2005 judgment for $252,930 as fees and costs, not as child support?

Because we find merit in Father's fifth issue, we shall vacate the order of the circuit court and remand the case for further proceedings, with directions.

## FACTS AND PROCEEDINGS

Darren was born on November 8, 1999, in Houston, Texas. At that time, Mother was in her late 30's and held a doctoral degree in physics. Father was in his early 50's and was a tenured full professor of civil engineering at Texas A & M University. Father is a dual citizen of the United States and Turkey.

Mother and Father were not married to each other (and never have been). Mother was working as a research associate for Father. The two commenced an intimate relationship and decided to have a baby. Mother became pregnant and, when she was at three months gestation, moved into Father's house.

In fact, during all this time, Mother was married to another man—one Eric Benck, Ph.D., a physicist. Mother and Benck had married in 1984. They had made their home in Maryland, where Benck still was living.[1] The couple was childless.

On January 21, 2000, when Darren was 11 weeks old, Mother left Texas with him and returned to Maryland, to her home with Benck. Nevertheless, for another year, until Feb-

---

1. It is not clear from the record how Mother, who was living in Maryland, came to be working for Father in Texas.

ruary 2001, Mother and Father continued in an intimate relationship. Mother represented to people in Maryland that Darren was Benck's child, however.

For the first two years of Darren's life, Mother allowed Father to have daytime visitation with Darren in Maryland. On August 27, 2001, Father married a Turkish woman who held the position of Undersecretary to the Prime Minister of Turkey. Thereafter, the relationship between Mother and Father became increasingly strained. On December 20, 2001, in the Circuit Court for Montgomery County, Mother filed a complaint for custody and child support.[2] After Father filed an answer, a scheduling order was entered.[3] The case proceeded through discovery. Mother continued to give Father access to Darren for daytime visitation in Maryland.

The case turned sharply off course on May 5, 2002, when Father and his wife abducted Darren and took him to Turkey. The abduction was well planned. Father had taken a sabbatical from his teaching position in Texas and had lined up a teaching position in Turkey.

The day after the abduction, Father called Mother and told her that he was in Turkey, but would not disclose his location there, and that she would never see Darren again. That same day, Mother sought and was awarded immediate temporary emergency custody of Darren in the pending action. The court ordered Father to return the child to Mother's custody. Father did not comply.

Mother filed an amended complaint seeking immediate custody. The case went to a merits trial on July 23, 2002. Mother appeared with counsel. Neither father nor his counsel appeared. The court awarded Mother immediate sole legal and physical custody of Darren and child support in an amount to be determined. The court also awarded Mother

---

**2.** Father previously had filed a custody action in Houston, but never served Mother with the suit papers.

**3.** Father acknowledged paternity in the court proceedings. He did not file an affidavit of paternity, however.

$100,000 "as [Father's] initial contribution towards the fees, costs, and expenses including attorney's fees incurred by" her in undertaking legal action in Turkey to secure Darren's return.

On August 7, 2002, the court entered an order memorializing the decisions stated above and setting the monthly child support award at $1,040, retroactive to December 20, 2001. The court entered a judgment for the $100,000 in counsel fees and costs and for $7,280 in child support arrears.

During Father's career in academia, he had accumulated substantial retirement benefits through the Teachers Insurance and Annuity Association–College Retirement Equities Fund ("TIAA–CREF"). In late December 2002, the court entered a qualified domestic relations order ("QDRO") that enabled Mother to collect child support from Father's TIAA–CREF retirement benefits account.

From the day Darren was abducted, for over two years, Mother devoted herself to recovering him. She contacted members of Congress, the State Department, the FBI, the Turkish embassy, and the Montgomery County State's Attorney's Office, none of whom were able to give her any positive assistance. She traveled to Turkey and took the steps necessary to initiate an international child custody proceeding under the Hague Convention. (Father refused to do so himself.) She hired a Turkish attorney and an expert on Turkish law and the Hague Convention. She learned that Turkey only had become a party to the Hague Convention two years prior and that the Turkish courts were reluctant to effectuate the return of abducted American children. Indeed, until then, there had not been any case in which an American child abducted to Turkey had been returned to the United States as the result of a Hague Convention proceeding. At some point during the two year period, President Bush discussed the case with the Prime Minister of Turkey, in an effort to persuade the Turkish government to return Darren.

Mother decided that, given the political situation in Turkey, and that Father's wife was a high ranking government official,

it was necessary for her to pursue all means—both within and outside the Turkish legal system—in order to obtain Darren's return. She retained Corporate Training Unlimited, Inc. ("CTU"), a company that specializes in rescuing children who have been kidnapped to foreign countries. CTU put together intelligence and surveillance teams made up of Turkish citizens outside of Ankara (the capital city) to insulate them from political influence and pressure.

It took about six weeks for CTU to locate Father and Darren in Turkey. Six months after the abduction, Mother first saw Darren again. By then, he no longer could speak English and was speaking only Turkish.

At the first Hague Convention hearing, the judge granted Mother weekly visitation with Darren from Wednesday at 9:00 a.m. to Thursday at 6:00 p.m. According to Mother, however, for the next two years, Father did not allow her to visit with Darren overnight. Although not part of the Turkish court's order, Father supervised all of Mother's visits with Darren.

On August 8, 2003, in the circuit court, Mother filed a motion seeking to have Father held in contempt for failing to return Darren to her custody in accordance with the court's custody orders. The court issued a show cause order. Through counsel, Father filed an opposition. A hearing was held on January 16, 2004.[4] Neither Father nor his counsel attended. Counsel for Mother introduced evidence showing that Mother had made 11 trips to Turkey in connection with the Hague Convention proceeding and CTU's efforts to recapture Darren, and that she had incurred $255,000 in attorney's fees and expenses in doing so.

The court found Father in contempt for failing to return Darren to Mother. The judge stated:

---

4. In the meantime, on November 25, 2003, at Mother's request, the court issued an order determining that Father owed $5,200 in child support arrearages for the months of August 2002 through December 2002, and entered judgment against Father for that amount.

So I find the defendant to be in contempt of court. The defendant may purge himself of this contempt finding by submitting himself to the jurisdiction of this court within the next 30 days. I find also that the defendant's [opposition] . . . is one which should not be considered until such time as the defendant returns and submits himself to the jurisdiction of the court.

So I will strike the [opposition] . . . until such time as the defendant returns and submits himself to the jurisdiction of this court.

I have before me expenses that have been incurred in this process. This process totaling $255,000. *So I will award costs as requested in the amount of $200,000 on behalf of [Mother].*

(Emphasis added.)

On January 23, 2004, the court issued an order striking Father's opposition; finding him to be in contempt; directing Father to pay $200,000 to Mother and that a judgment in that amount be entered; and stating, "[Father] may purge himself of this Contempt Order by submitting himself to the jurisdiction of this court within thirty (30) days[.]" The order was entered on January 30.

Father initially prevailed in the Hague Convention case. Mother took an appeal, however, and ultimately prevailed in the Supreme Court of Turkey. The court determined that the United States was Darren's "home state," which meant Father had to return him to Mother's custody. Apparently, once that ruling was made, discussions ensued between counsel for the parties, resulting in a comprehensive agreement about custody, visitation, and numerous other issues.

On July 15, 2004, the parties filed a joint motion for change of custody. Father returned Darren to the United States the next day. On July 20, 2004, the parties submitted a Consent Order, embodying their agreement, which was approved by the court and entered that day. The Consent Order provided among other things that Mother would have primary physical

custody and sole legal custody of Darren and Father would have visitation that would be implemented gradually.

Six days after entry of the Consent Order, Mother filed an emergency request to have Father's visitation supervised, citing concerns about reabduction. Father opposed the request. The court held a hearing on July 28, 2004, and granted Mother's request; an order directing that Father's visitation with Darren be supervised was entered on August 3. About two weeks later, on August 16, Father filed a suggestion of bankruptcy, asserting that on August 11, he had filed a Chapter 7 bankruptcy petition in a Texas federal court.

On September 3, 2004, Mother filed, *inter alia,* a response to Father's suggestion of bankruptcy, in which she asked the court to clarify that the $200,000 judgment entered on January 30, 2004, was an award of child support. She also filed a motion asking among other things that the Consent Order be set aside and for an award of counsel fees and costs incurred in attempting to enforce the court's custody order.

The court held a hearing on the outstanding motions, on November 5, 2004. Mother made two assertions about the $200,000 judgment. First, she maintained that the judgment was "in the nature of a fine" for "civil and criminal contempt," which she argued is not dischargeable in bankruptcy. Second, she asserted that the $200,000 judgment was "in the nature of child support," which she also argued is not dischargeable in bankruptcy.

The court ruled that the $200,000 judgment was a "sanction" it had imposed against Father for violating the court's custody order commanding him to return Darren to Mother. It also ruled that the $200,000 judgment was not "in the nature of child support."

In addition, the court ruled that the proceedings were not subject to the automatic stay. It denied Mother's motion to set aside the Consent Order. It did not address Mother's request for counsel fees and costs incurred in attempting to enforce the court's custody order. On November 9, 2004, the court entered orders memorializing its decisions.

A little over a month later, on December 16, 2004, Mother filed what she entitled a motion for child support, asking that she be awarded a lump-sum amount of child support equal to the sums she had expended in securing Darren's return from Turkey. Father filed a timely opposition. The motion and others not relevant to this appeal were set in for a hearing, which was postponed several times and ultimately set in for June 23, 2005.

In the meantime, in the Texas bankruptcy case, Mother filed a "Complaint to Determine Dischargeability of Debt under U.S.C. § 523(a)," seeking a ruling that the $200,000 judgment in her favor was not dischargeable in bankruptcy. The bankruptcy court held an evidentiary hearing, at which Mother and Father testified, and on May 18, 2005, issued a memorandum opinion and order determining that the judgment was non-dischargeable "for willful and malicious injury by [Father] to [Mother]," under 11 U.S.C. section 523(a)(6). On May 23, 2005, in the domestic case, Mother filed a "line" attaching the memorandum opinion and order of the Texas bankruptcy court.

The evidentiary hearing on Mother's motion for child support began as scheduled on June 23, 2005, and continued into the next day. Mother introduced evidence that CTU had been paid $200,000 for the rescue efforts for Darren. The court found that that sum was necessary, fair, and reasonable to enforce its custody orders. Mother also introduced evidence that she had incurred $7,440 for Turkish lessons. The court found that that expense was fair and reasonable, and that the lessons had been necessary because Darren no longer was able to speak or understand English. Mother also introduced evidence of attorneys' fees and expenses for transportation, lodging, shipping, health insurance, document translation, telephone bills and other expenses, all supported by receipts, incurred in her efforts to have Darren returned to her custody. The court found that the fees and costs all were reasonable and necessary to enforce its custody orders.

During the hearing, Father argued that most of the fees and costs Mother was seeking were incurred before the entry of the court's January 30, 2004 judgment for $200,000, and were for the exact same expenses covered by that judgment. He maintained that Mother could not recover the same expenses twice and asked the court to calculate any award of counsel fees and costs by subtracting the $200,000 judgment. Mother responded that the $200,000 judgment was a contempt sanction, not an award of counsel fees and costs, and therefore should not be subtracted from the court's award.

Also during the hearing, Mother asked the court to characterize any award of counsel fees and costs she was claiming as an award of child support. The court determined, however, that the counsel fees and costs Mother was claiming were not child support; and therefore any award it might make would not be a child support award.

After hearing argument of counsel, the court ruled from the bench. The judge found that, as a result of Father's having abducted Darren and absconded with him to Turkey, Mother had incurred a total sum of $352,930 in counsel fees and costs to secure custody of Darren. He further found that Mother had received $100,000 of that sum by collecting her judgment in that amount against Father's TIAA–CREF retirement pension account. The judge awarded Mother the balance of $252,930. He declined to deduct from that sum the $200,000 judgment of January 30, 2004. (None of the $200,000 has been collected. As noted above, however, the judgment was ruled nondischargeable in the Texas bankruptcy case.)

The court immediately entered an order directing Father to pay the $252,930 to Mother within 30 days. When Father did not do so, the court entered judgment for that amount against him, on July 28, 2005. Mother filed a notice of appeal on August 17, 2005. A week later, Father filed a notice of appeal.[5]

---

5. For reasons that are not clear, Father has been denominated "appellant" and "cross-appellee" and Mother "appellee" and "cross-appellant," even though Mother filed her notice of appeal first.

To the extent necessary, we shall include additional facts in our discussion of the issues.

## DISCUSSION

### I.

*Did the circuit court err by treating Mother's motion for child support as a motion for counsel fees and expenses?*

**(Father's Question I)**

*Did the circuit court err by awarding Mother $252,930 in expenses, rather than in child support?*

**(Mother's Question I)**

Father contends that because Mother's December 16, 2004 filing was entitled a motion for child support, the court erred by *sua sponte* treating it as a motion for counsel fees and costs, under FL section 12–103, and therefore further erred by granting Mother such an award.[6]

---

6. FL section 12–103 provides, at subsection (a), that "[t]he court may award to either party the costs and counsel fees that are just and proper under all the circumstances in any case in which a person: (1)applies for a decree . . . concerning the custody, support, or visitation of a child of the parties; or (2) files any form of proceeding: (i) to recover arrearages of child support; (ii) to enforce a decree of child support; or (iii) to enforce a decree of custody or visitation." The statute requires, at subsection (b), that before awarding costs and counsel fees the court must consider "the financial status of each party[,]" "the needs of each party[,]" "and whether there was substantial justification for bringing, maintaining, or defending the proceeding."

Father did not argue below, and does not contend on appeal, that the judgments granted by the court to Mother were for expenses that are not "costs" within the meaning of FL section 12–103. We note, in addition, that "costs" as used in this statute has been interpreted to mean "suit money," and not to mean court costs. *Bracone v. Bracone,* 16 Md.App. 288, 295 A.2d 798 (1972) (affirming award of travel expenses to wife as an award of "costs"). *Cf. Colburn v. Colburn,* 15 Md.App. 503, 519, 292 A.2d 121 (1972) (observing that "[t]hose expenses which are reasonable and necessary to *carrying on the suit* as well as those necessary for preliminary investigative purposes are properly classified as 'suit money' in a divorce case. . . .").

Mother's single contention on cross-appeal is a variation on this same theme. She maintains that the costs she incurred in her efforts to secure Darren's return from Turkey constituted child support, and that the court should have categorized all of her expenditures for securing Darren's return, except her counsel fees, as child support.

We do not find merit in either of these contentions.

■ To begin, Father is precluded from contending on appeal that the court erred by treating Mother's motion as one for attorney's fees and costs because that contention is diametrically opposed to the position he argued below. *See Gordon v. Posner*, 142 Md.App. 399, 424–26, 790 A.2d 675 (2002); *Billman v. State Deposit Ins. Fund Corp.*, 86 Md.App. 1, 20–21, 585 A.2d 238 (1991) (both discussing doctrine of judicial estoppel). In the circuit court, Father argued that Mother's motion was *not* one for child support, and could not be, because child support cannot be modified retroactively; and that the fees and costs that Mother was seeking were not child support under Maryland law. Having taken that position below, Father cannot argue to the contrary on appeal.

■ Even if Father previously had advocated the position he now advances on appeal, we would reject his argument. It is well established in Maryland law that a court is to treat a paper filed by a party according to its substance, and not by its label. *See, e.g., Alitalia Linee Aeree Italiane v. Tornillo*, 320 Md. 192, 195, 577 A.2d 34 (1990) ("Ordinarily, 'magic words' are not essential to successful pleading in Maryland. Courts and administrative agencies are expected to look at the substance of the allegations before them, not merely at labels or conclusory averments."); *Gluckstern v. Sutton*, 319 Md. 634, 650–51, 574 A.2d 898 (1990) (treating document labeled as "memorandum" as a motion to revise); *Higgins v. Barnes*, 310 Md. 532, 535 n. 1, 530 A.2d 724 (1987) (noting that "our concern is with the nature of the *issues* legitimately raised by the pleadings, and not with the labels given to the pleadings"); *Frederick County Bd. of Comm'rs v. Sautter*, 123 Md.App. 440, 451–52, 718 A.2d 685 (1998) (observing that, in court

filings, substance is more important than form); *see also Esteps Elec. & Petroleum Co. v. Sager,* 67 Md.App. 649, 652, 508 A.2d 1032 (1986), and *Flying "A" Serv. Station v. Jordan,* 17 Md.App. 477, 482, 302 A.2d 650 (1973) (both cases treating motions for reconsideration as motions for rehearing).

■ In substance, Mother's motion was a request for an award to reimburse her for the counsel fees and costs she had incurred in securing Darren's return from Turkey; notwithstanding its label, the motion was not a request for child support. Accordingly, the court did not err in *sua sponte* treating the motion as one made pursuant to FL section 12–103.

■ There also is no merit to Mother's argument that the court should have denominated its $252,930 award as child support. Under Maryland law, counsel fees and costs incurred by a parent in a custody case are not child support, even when they are for the benefit of the child.

In *Goldberg v. Miller,* 371 Md. 591, 810 A.2d 947 (2002), the Court of Appeals held that the fees of a lawyer appointed to represent a child in a custody case were not child support. The Court explained that the trial court, which had ruled that its order directing the parents to pay those fees was " 'in the nature of child support,' " 371 Md. at 601, 810 A.2d 947, lacked authority under Maryland law to do so. The circuit court does not have the authority to "select, at its complete discretion, which of its orders should be deemed child support." *Id.* at 603, 810 A.2d 947.

The Court went on to explain that, whether an award is child support must be determined, instead, by application of Maryland's statutory child support scheme. When the General Assembly enacted the child support guidelines, and certain other portions of the child support chapter of the Family Law Article, it decided what specific expenses that are not part of the parents' basic child support obligation nevertheless constitute child support. Those expenses include actual child care expenses incurred due to either parent's employment, FL § 12–204(g); extraordinary medical expenses, FL § 12–

204(h); special or private school expenses, FL § 12–204(i)(1); expenses for transportation of the child between the parents' homes, FL § 12–204(i)(2); expenses related to medical support, FL § 12–101(d); and a requirement that a parent include the child in that parent's health insurance coverage, FL § 12–102(b). That is the extent of payments that are child support, or are in the nature of child support, under Maryland law.

The *Goldberg* Court made clear that federal bankruptcy law about what obligations are child support or "in the nature of child support," for purposes of being excepted from discharge under 11 U.S.C. section 523(a)(5), does not bind state courts in deciding what constitutes child support under state law. It also made clear that the federal bankruptcy courts likewise are not bound by state law in deciding what obligations are child support or "in the nature of child support" within the meaning of the federal bankruptcy statute and regulations.

■ In the case at bar, notwithstanding that the expenses incurred by Mother to return Darren to her custody might have benefited him, the expenses were not child support under Maryland law; rather, they were costs incurred by Mother in prosecuting the child support action by seeking enforcement of the court's custody order, including by pursuing Hague Convention litigation in Turkey and by retaining experts in foreign abductions to locate Darren and attempt to gain his release.[7] The hearing court did not err by ruling that its award of fees and costs incurred by Mother in rescuing Darren from Turkey was not child support, or in the nature of child support, under Maryland law.

The only reason the parties are arguing over whether the court could *sua sponte* treat Mother's motion as one for counsel fees and costs, and whether the $252,930 judgment is for child support, is that they believe the answers to those

---

7. The only expense Mother sought to recover that indeed is child support under the Maryland statutory scheme is the $2,000 cost for therapist reunification services.

questions will determine the outcome of Father's second question presented—whether that judgment was entered in violation of the automatic stay in bankruptcy, under 11 U.S.C. section 362. As we shall explain, that issue is to be decided under federal law, not Maryland law; and federal law about what obligations are child support, or "in the nature of child support," differs from Maryland law on that subject. Therefore, our answers to these two questions do not have the significance the parties believe they do.

## II.

*Is the circuit court's July 28, 2005 judgment for $252,930 void because the proceeding on Mother's motion was subject to the automatic stay in bankruptcy?*

Father maintains that the automatic stay in bankruptcy applied to the proceedings in this case after he filed his Chapter 7 bankruptcy petition, and as a consequence, the circuit court's July 28, 2005 judgment, entered when the stay was in effect, is void. Without citing any cases or discussing the pertinent statutory language, Father states simply that, even though section 362(b) "provides for exceptions relating to domestic matters for paternity, divorce, collection of alimony and child support . . . [t]here is no exception for collection of counsel fees and costs."

Mother responds that, if her December 16, 2004 motion properly was treated by the court as one for counsel fees and expenses, and not for child support, and therefore the $252,930 judgment was for expenses, not child support, then the automatic stay indeed was in effect, and the court's judgment must be vacated.

Neither party's argument has merit.

■ Whether the automatic stay was in effect is a question of law that we decide *de novo. In re Merry–Go–Round Enters., Inc.,* 180 F.3d 149, 154 (4th Cir.1999). In addition, even if the parties agree that the automatic stay was in effect, we are not bound by their agreement on a pure question of law. *See Crown Oil & Wax Co. of Del., Inc v. Glen Constr.*

*Co. of Va., Inc.,* 320 Md. 546, 567, 578 A.2d 1184 (1990) (observing that an appellate court is "not bound by stipulations on matters of law").[8]

█ Section 362(a) of the federal Bankruptcy Code mandates the automatic stay of a broad range of proceedings against a debtor upon the filing of his or her Chapter 7 bankruptcy petition, including

> the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

The purpose of the automatic stay is

> to give the debtor a "breathing spell" from his/her creditors, to allow time to formulate a repayment or reorganization plan, and to prevent a chaotic and uncontrolled scramble for the debtor's assets in a multitude of uncoordinated proceedings in different courts, by ensuring that all claims against the debtor, other than those exempted from the stay, will be brought in a single forum.

*Klass v. Klass,* 377 Md. 13, 22, 831 A.2d 1067 (2003).

There are exceptions to the automatic stay, however, which are enumerated in subsection (b) of section 362. In November

---

**8.** The automatic stay issue was addressed and decided by the circuit court during the November 5, 2004 hearing.

Father did not note an appeal within 30 days of the entry of that order. We have jurisdiction over this issue on appeal, however, because the November 9, 2004 order was not a final judgment within the meaning of Md.Code (1973, 2002 Repl.Vol.), section 12–301 of the Courts & Judicial Proceedings Article ("CJ"). A final judgment "must either determine and conclude the rights of the parties involved or deny a party the means to 'prosecut[e] or defend[ ] his or her rights and interests in the subject matter of the proceeding.' " *In re Samone H.,* 385 Md. 282, 298, 869 A.2d 370 (2005) (quoting *Rohrbeck v. Rohrbeck,* 318 Md. 28, 41, 566 A.2d 767 (1989)). The November 9, 2004 order did not determine the parties' rights in this case; it only determined that an automatic stay was not in effect, and therefore the parties could proceed to have their rights adjudicated. Accordingly, Father could not have taken an appeal from that aspect of the November 9, 2004 order.

2004, as pertinent to the case at bar, that subsection excepted from the automatic stay "the commencement or continuation of an action or proceeding for (i) the establishment of paternity; or (ii) the establishment or modification of an order for alimony, maintenance, or support" or for "the collection of alimony, maintenance, or support from property that is not property of the estate." 11 U.S.C. § 362(b)(2)(A) and (B).[9]

In *Klass v. Klass, supra,* 377 Md. 13, 831 A.2d 1067, the Court of Appeals considered the scope of the automatic stay exceptions then in effect (in 2003) that pertained to family law proceedings. The husband had filed a Chapter 7 bankruptcy petition while his divorce case was pending in a Maryland state court. The court granted the parties an absolute divorce, ordered the husband to pay the fees of the children's attorney, and also ordered him to pay the wife's attorney's fees. The court entered judgments for the fee awards. As here, the husband challenged those judgments on appeal on the ground that they were void because they were entered in violation of the automatic stay.

The Court of Appeals prefaced its analysis by explaining that a state court has concurrent jurisdiction with the federal courts to determine whether and how a matter before the state court may be affected by the automatic stay provision in section 362(a). The state court must apply federal bankruptcy law in making that determination, however. On the merits, the Court held that, notwithstanding that fees awarded to a lawyer for services to a child or children in a divorce, custody, or child support case *do not* constitute child support *under Maryland law, see Goldberg, supra,* 371 Md. at 607–08, 810 A.2d 947, for purposes of section 362(b), *under federal bank-*

---

**9.** Effective October 17, 2005, section 362(b)(2) was amended. Among other things, that subsection now excepts from the automatic stay "a civil action or proceeding ... for the establishment or modification of an order for domestic support obligations; [or] *concerning child custody or visitation* [.]" Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, § 214, 119 Stat. 23 (emphasis added). This amendment, which broadens the class of domestic cases that are excepted from the automatic stay, does not apply to cases filed before the effective date, however.

*ruptcy law,* those fees *do* constitute child support. Under federal bankruptcy law, the "judgment entered in favor of the [children's lawyer] did no more than establish that component of child support; it was not subject to the stay." *Klass, supra,* 377 Md. at 27, 831 A.2d 1067. Similarly, and noting that "[m]ost States regard attorney fees to a spouse as in the nature of spousal support," the Court held that the judgment against the husband for the wife's attorney's fees was not entered in violation of the automatic stay. *Id.*

In so concluding, the Court relied upon some federal cases interpreting section 362(b) and others interpreting section 523(a)(5)(A), which makes non-dischargeable a debt designated as alimony, maintenance, or support that is actually "in the nature of" alimony, maintenance, or support. The Court observed that it is the prevailing view among federal courts and bankruptcy courts that, under section 523, "judgments against a debtor for fees payable to a [lawyer for a minor child] in a divorce, custody, or child support case are in the nature of child support and are therefore not dischargeable[,]" but that the federal caselaw on the issue in the context of the section 362 automatic stay was "scant." 377 Md. at 25, 831 A.2d 1067.

The Court reasoned, however, that it makes sense to read the sections coterminously, so that when judgments are not dischargeable under section 523, because they are in the nature of child support, the proceedings that produce the judgments likewise are not precluded by the automatic stay, under section 362. "[T]he provisions in each [section] relating to child support rest on the same stated policy of not allowing debtors to use bankruptcy petitions to avoid legitimate marital and child support obligations." 377 Md. at 26, 831 A.2d 1067.

In addition, the Court observed, the language of section 362 is broader than that in section 523: section 362 covers proceedings for "alimony, maintenance, and support," while section 523 covers debts designated as alimony, maintenance, or support, so long as they are in fact in the nature of alimony, maintenance, and support. "Thus, if an order that is not

precisely in the form of direct periodic monetary support for a child is regarded nonetheless as child support for purposes of § 523, there is little reason not to regard it likewise for purposes of § 362(b)." 377 Md. at 26, 831 A.2d 1067.

■ In the instant case, whether Mother's December 16, 2004 motion was subject to the automatic stay in bankruptcy is a question of federal bankruptcy law, not Maryland law. *Klass, supra,* 377 Md. at 27, 831 A.2d 1067. If the expenses for which she was seeking reimbursement were child support or "in the nature of child support" under federal law, the automatic stay did not apply to bar proceedings on the motion.

■ In the dischargeability context, it is well-established in federal bankruptcy law that debts for actual expenses incurred in enforcing a state court's custody order are "in the nature of child support," and hence are non-dischargeable under section 523(a)(5)(A). *See In re Ray,* 143 B.R. 937 (D.Colo.1992) (holding that attorney's fee award to father in contempt action against mother for violating custody order was "in the nature of child support" and therefore was a non-dischargeable debt); *In re Castro,* 74 B.R. 38 (Bankr.M.D.Fla.1987) (holding that judgment obtained by a father for expenses incurred to enforce custody order that mother had violated was non-dischargeable because expenses were in the nature of child support); *In re Sposa,* 31 B.R. 307 (Bankr.E.D.Va.1983) (holding that judgment against father for attorney's fee, commissioner's fee, and expenses incurred by mother in prosecuting fraudulent conveyance claim against him, in order to place child support lien on property fraudulently conveyed, was for expenses "in the nature of child support," and hence non-dischargeable).

We have found two dischargeability cases that have dealt with expenses incurred by a parent in recovering a child abducted by the other parent. In *In re Castro, supra,* 74 B.R. 38, a state court awarded custody of one child to the father and custody of the other child to the mother. The father was to have visitation with the child in the mother's custody. The mother and her new husband abducted the child for whom the

father had custody, and refused to allow the father to have contact with either child. The father incurred expenses in his efforts to enforce the court's custody order, and in a state court suit obtained a judgment against the mother for those expenses. When the mother filed for bankruptcy, the bankruptcy court was asked to decide whether the judgment was dischargeable. The court ruled that it was not, because it was for expenses actually incurred in enforcing a custody order, and therefore was in the nature of child support.

In *In re Hicks*, 65 B.R. 227 (Bankr.D.N.M.1986), a mother and father were divorced, and the mother was granted custody of their child. Sometime soon thereafter, the father abducted the child. The father managed to conceal the child's whereabouts for two years. After the mother obtained the child's return, she moved the state court to order the father to pay the counsel fees and costs she had incurred to regain custody of the child. The court did so, directing the father to reimburse the mother for " 'reasonable expenses incurred by [her] for the search of the minor child.' " 65 B.R. at 228–29.

The father then filed a Chapter 7 bankruptcy petition. The mother filed a complaint in the bankruptcy court to have the father's debt deemed non-dischargeable, under sections 523(a)(5)(debts for child or spousal support) and (a)(6) (debts for willful and malicious injury) of the Bankruptcy Code. Explaining that its task was to determine the "true character of the debt," 65 B.R. at 229, the bankruptcy court concluded that the award of counsel fees and costs incurred in securing the child's return was non-dischargeable, as a support obligation under section 523(a)(5). The court took guidance from the holding in *In re Sposa, supra*, 31 B.R. at 311, that in deciding dischargeability, the court must determine whether the proceeding that gave rise to the debt was directly related to a primary support obligation, even if the debt was entered as a judgment in an ancillary proceeding. The *Hicks* court held that "child support," as used in section 523(a)(5), includes actual costs incurred in enforcing a custody order, and that the judgment for the mother's counsel fees therefore was non-dischargeable. (The court found it unnecessary to address

whether the debt was non-dischargeable as one for willful and malicious injury under section 523(a)(6).)

We also have found one bankruptcy case that granted relief from the automatic stay for a mother to collect, against the father's bankruptcy estate, an award of $75,000 in counsel fees and $10,000 in expenses she incurred in recovering her children, after they were kidnapped by the father in violation of a state court's custody order. In *In re Gedeon*, 31 B.R. 942 (Bankr.D.Colo.1983), the bankruptcy court first determined that the attorney's fee award of $75,000 was non-dischargeable under section 523(a)(5), as alimony, maintenance, or support for a former spouse or child of the debtor. The court stated:

> [I]t is in the best interests of the children to have custody matters fully and fairly litigated. Insuring this is done is part of the debtor's duty to support his children. The [mother] has been awarded attorney fees to put her on an equal footing to pursue the matter of custody and support. By full representation the trial judge can better determine what is for the best interests to insure the welfare of the children.

31 B.R. at 945. Employing the same reasoning, the court determined that the debt for $10,000 in expenses also was non-dischargeable. "This would also appear to be an award to put the spouse on an equal footing in the litigation of the dissolution of marriage matters and further was for the benefit and support of the minor children." *Id.* The court went on to decide that the automatic stay did not bar the mother from collecting the counsel fees and costs against the father's bankruptcy estate assets.

These cases lead us to conclude that, under federal law, the $252,930 judgment Mother obtained against Father for counsel fees and costs she incurred in seeking Darren's return to Maryland, to her custody, would be non-dischargeable under section 523(a)(5), as child support, or in the nature of child support. The fees and costs Mother incurred were necessary to enforce the court's custody orders of May 6 and July 23, 2002, were directly related to the custody proceedings

for Darren, and were incurred to further his best interests, as the circuit court had found them to be.[10]

Applying the reasoning of the Court of Appeals in *Klass*, we further conclude that proceedings on Mother's December 16, 2004 motion seeking reimbursement of the actual expenses she incurred in enforcing the court's custody orders were not barred by the automatic stay in bankruptcy. The proceedings were being prosecuted to recover sums Mother expended that were child support, or in the nature of child support, within the meaning of section 523(a)(5), as interpreted under federal law; and therefore the proceedings were excepted from the automatic stay under subsection 362(b)(2). Accordingly, the circuit court's July 28, 2005 judgment for $252,930 is not void.[11]

## III.

### *Did the hearing judge err by denying Father's recusal motion?*

At the close of Mother's presentation of evidence on June 24, 2005, Father moved the hearing judge to recuse himself. The judge denied the motion. Father now contends that the judge erred by not recusing himself from the case. He argues that the judge harbored a personal bias against him, as evidenced by certain remarks he made during the hearing.

The hearing began with Father's counsel reciting the facts of the case to the court. Before the presentation of any

---

10. As we shall explain below, much of the fees and expenses covered by the July 28, 2005 judgment are the same fees and expenses covered in the January 30, 2004 judgment. That judgment was determined to be non-dischargeable, as damages for a willful and malicious injury inflicted by Father upon Mother. That non-dischargeability determination does not mean, however, that the fees and expenses incurred by Mother to enforce the court's custody orders are not also non-dischargeable as a child support obligation. The two are not mutually exclusive.

11. Under section 362(b) as revised by the 2005 amendments, it is clear that the proceeding on Mother's motion was not subject to the automatic stay. At a minimum, the expenses for which she was seeking reimbursement "concerned child custody or visitation."

evidence, the hearing judge engaged counsel in discussion about a number of legal issues. Father points us to the following remarks made during that discussion to support his claim of bias.

This colloquy occurred when counsel for Father was arguing that Mother's allegations were overstated and that Father already had a $200,000 judgment against him and had paid $100,000.

[COUNSEL FOR FATHER]: So, what we're talking about is making [Father] pay another—

THE COURT: Yes.

[COUNSEL FOR FATHER]:—$299,000?

THE COURT: Whatever [Mother] can prove. That's right. The chickens come home to roost sometime.

Then, in discussing whether the prior $200,000 judgment was a purgeable contempt fine, counsel for Father said that she would check to see if it was purgeable, and then ask that it be purged, explaining, "He definitely voluntarily came back. He did not threaten her life. He did not threaten to keep the child there. He can testify to that." The judge responded, "What do you mean he didn't threaten to keep the child there? He put them through hell and back."

Father also complains about the hearing judge's characterization of Father's actions as "dastardly act[s]" and "kidnapping." Later, on cross-examination, Donald Feeney, Jr., the owner of CTU, acknowledged that some of the acts in which he engaged in attempting to rescue Darren were illegal under Turkish law. Father's counsel asked, "Okay. So what you did, and what you're asking [Mother] to reimburse you for [is] an expense for an illegal act[?]" The judge asked counsel how she could ask such a question, remarking, "That's preposterous in view of what your client's done." Also, when Father's lawyer asserted that Father already had paid the recovery costs, the judge responded that Father had not paid them, and said to Father's counsel, "you are really an excellent lawyer, because [Father] ought to be in jail."

In addition, during her direct examination of Mother, Mother's counsel stated that she wanted to elicit testimony about the effect of the abduction on Darren, and needs he had as a result of having been abducted. After Father objected, Mother's counsel explained that the best interest standard applied because the proceeding was a child support case. In disagreeing, the judge stated, "I don't think there's any question your client is entitled to an award of costs for what she went through and expended to kind of put this car back on the road . . . ."

When Father's counsel moved the hearing judge to recuse himself at the close of Mother's case, the judge asked why Father thought he could not get a fair hearing. Father's counsel responded, "there's no question that . . . what he did was not right . . . the biggest concern [is] the statement that [Mother] will get an award and you've proven more than $299,000 or three, whatever, of expenses." The judge responded that he had not made any statements about what Mother had proved. Counsel added that her recusal motion also was based on the judge's comments that Father should have gone to jail and that Mother was entitled to a judgment.

The judge replied that he had listened to Father's counsel's arguments many times, had ruled on them, and believed his reasoning was sound. He opined that his adverse rulings had no bearing on whether Father could get a fair trial. He pointed out that Father indeed had kidnapped the child, and stated, "[t]here's no other way to say it." He also noted that Mother had testified that Father called her from Turkey and said she would never see her child again. The judge recounted the pains that Mother had to go through in order to have Darren returned to her custody.

The judge stated that he saw nothing wrong with his comments in this regard, as the parties' July 20, 2004 Consent Order had made clear that Father's lawyer persuaded Mother not to pursue criminal charges, and that, if she had not so agreed, Father could have been charged with and convicted of kidnapping. The judge pointed out that Father had admitted,

through counsel, to abducting Darren, and that his actions had been wrongful. The judge acknowledged that it was unclear whether Father had returned the child to Mother voluntarily. He pointed out that some of his rulings had been in Father's favor. The judge concluded,

I just don't believe that it's been appropriately shown that there's a reason for recusal. If the Court recused itself every time that it made a comment about what the factual circumstances were of this case and there's just no debate about the factual circumstances, then no trials would ever be conducted. Because somebody said the truth to your client that but for good lawyering, he'd be in serious problems from a criminal standpoint, he thinks that's unfair. That's just, the Court doesn't agree with that at all.

Canon 3 of Rule 16–813(the Maryland Code of Judicial Conduct) provides in pertinent part:

D. **RECUSAL.** (1) A judge shall recuse himself or herself from a proceeding in which the judge's **impartiality** might reasonably be questioned, including an instance when: (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer or extra-judicial knowledge of a disputed evidentiary fact concerning the proceeding[.]

In *Attorney Grievance Commission of Maryland v. Shaw,* 363 Md. 1, 766 A.2d 1028 (2001), the Court of Appeals summarized the law governing the recusal of a judge based upon bias toward a litigant:

"[T]here is a strong presumption in Maryland, and elsewhere, that judges are impartial participants in the legal process, whose duty to preside when qualified is as strong as their duty to refrain from presiding when not qualified." *Jefferson–El v. State,* 330 Md. 99, 107, 622 A.2d 737, 741 (1993) (citations omitted). The decision to recuse oneself ordinarily is discretionary and will not be overturned except for abuse. *See id.* The party requesting recusal has a heavy burden to overcome the presumption of impartiality and must prove that the judge has a personal bias or prejudice against him or her or has personal knowledge of

disputed evidentiary facts concerning the proceedings. *See id.* As to allegations of bias based on knowledge gained from a judicial proceeding, this Court stated:

> Only bias, prejudice, or knowledge derived from an extrajudicial source is "personal." Where knowledge is acquired in a judicial setting, or an opinion arguably expressing bias is formed on the basis of information "acquired from evidence presented in the course of judicial proceedings before him," neither that knowledge nor that opinion qualifies as "personal."

*Id.* (citations omitted).

*Shaw, supra,* 363 Md. at 11, 766 A.2d 1028.

 Father's bias argument rests entirely upon comments the hearing judge made about facts he was learning as the hearing progressed. Accordingly, any negative opinions the judge acquired about Father were based on the evidence, *i.e.*, were derived in the course of a judicial proceeding, and hence were not "personal." [12] We also find it notable that the hearing judge ruled in Father's favor on the issue of whether, under Maryland law, Mother's motion was one for child support, deciding that it was not. (As discussed previously, Father has taken a contrary position on this issue on appeal). The judge ruled that the motion was one for fees and costs, which, based on the arguments presented by counsel, he believed was a ruling that would disadvantage Mother in her collection efforts against Father.

Father did not meet his "heavy burden" to overcome the presumption of impartiality and to prove a personal bias on the part of the hearing judge. Accordingly, the hearing judge

---

12. The hearing transcript shows that the judge made a statement that Mother had "proved ... well in excess of $400,000, $399,000." He continued, "Are you seeking additional monies for fees for yourself or what?" Those statements were made upon Father's objection to Mother's introducing into evidence, through her own testimony, her attorney's hourly rate. In context, it is clear that the judge was asking whether Mother was seeking fees beyond those requested in her motion, and was not making a premature ruling.

did not abuse his discretion by denying Father's recusal motion.

## IV.

### *Did the parties' agreement, as embodied in the July 20, 2004 Consent Order, preclude Mother from recovering counsel fees and costs?*

The July 20, 2004 Consent Order, presented to the court by agreement of the parties, includes the following paragraph, quoted in pertinent part:

> ORDERED, that parties shall not initiate any new cause of action in any Court, in the United States or Turkey or anywhere else, whether criminal, civil, contempt or otherwise for past offenses or past actions arising from, related to, or involving the abduction of Darren, or legal proceedings arising therefrom. . . .

Father contends that by filing her motion for child support, which in substance was a motion for payment of counsel fees and expenses, Mother violated the Consent Order, *i.e.*, she "initiate[d] a[ ] new cause of action . . . for past offenses or past actions arising from, related to, or involving" Darren's abduction. He argues that the court should have granted his motion to dismiss Mother's motion, on the ground that she was precluded from making any such recovery by the terms of the July 20, 2004 Consent Order.

■■■ The circuit court's ruling was not in error. The plain language of the Consent Order prohibits the parties from initiating any *new* cause of action. Obviously, the custody case in the Circuit Court for Montgomery County was pending when the Consent Order was entered, as it was entered in that very case. Thus, Mother's motion, treated by the court as one for counsel fees and costs, was not a new cause of action.

■■■ Indeed, a motion for counsel fees and costs under FL section 12–103 is not a cause of action at all. It is a request for collateral relief in an already pending custody case. *See Blake v. Blake*, 341 Md. 326, 670 A.2d 472 (1996); *Dent v.*

*Simmons,* 61 Md.App. 122, 129–30, 485 A.2d 270 (1985). The circuit court correctly found that Mother had not initiated a new cause of action in violation of the parties' Consent Order.

■■■■■■■ We note as well that parents cannot, by agreement, usurp the court's exclusive, continuing jurisdiction over child support cases. A parent may not bargain away the child's right to support, and modification of that support, from the other parent. Any such agreement is at odds with the public policy in favor of responsible parents supporting their children financially. For those reasons, child support decisions always are within the sound discretion of the circuit court, regardless of any agreement between the child's parents. *See Petitto v. Petitto,* 147 Md.App. 280, 303, 808 A.2d 809 (2002) (agreement as to child support "does not take priority over the best interests of the child"); *Shrivastava v. Mates,* 93 Md.App. 320, 332, 612 A.2d 313 (1992) ("parties [can]not by contract bind a court to a particular amount of child support."); *Lieberman v. Lieberman,* 81 Md.App. 575, 578–88, 568 A.2d 1157 (1990) (child support is always subject to modification, even if a separation agreement provides otherwise).

## V.

### *Did the circuit court's prior award of $200,000 bar Mother from recovering the entire $252,930 in fees and costs she later was awarded?*

Father contends that the $200,000 judgment entered against him on January 30, 2004 was for payment of counsel fees and costs incurred by Mother that were for the most part the exact same fees and costs covered by the $252,930 judgment entered against him on July 28, 2005. He argues that the court erred by declining to subtract the overlapping $200,000 judgment from the $252,930 judgment. Essentially, he argues that he has been unfairly ordered to pay the same counsel fees and costs twice.

In her brief, Mother responds that the $200,000 judgment was a fine imposed against Father for contempt, not an award

of counsel fees and costs. She acknowledges that, in determining the amount of the sanction, the court considered the sums she had expended in pursuing Darren's return to the United States. She points out, however, that, during the November 5, 2004 hearing, the court clarified that the $200,000 judgment was a fine and not an award of child support or of counsel fees and costs. She concludes that, because the $200,000 judgment was not for counsel fees and costs, the court did not err by declining to subtract it from its later award of $252,930 for counsel fees and costs.

In oral argument before this Court, counsel for Mother asserted that the $200,000 award was a purge provision, and that, if Father had returned to Maryland with Darren within the 30–day time period specified in the court's order, the $200,000 judgment would have been vacated. Counsel conceded (contrary to the argument presented in Mother's brief) that the judgment was not a criminal contempt fine.

To analyze this issue, we must determine 1) whether the $200,000 judgment indeed was a contempt fine or instead was an award of counsel fees and costs; and 2) whether, after one circuit court judge ruled, after custody had been decided, that the $200,000 judgment entered before the custody decision was a contempt fine, a second circuit court judge, in deciding what was in substance a motion for counsel fees and costs, was bound by the earlier contempt fine decision.

If a contempt is civil, the sanction is coercive, that is, it is designed to remedy a contemptuous act or omission, by prompting conduct on the part of the contemnor, and must allow for purging. *State v. Roll*, 267 Md. 714, 728, 298 A.2d 867 (1973). If a contempt is criminal, the sanction is punitive, that is, to penalize the contemnor for past conduct. *Id.; see also Betz v. State*, 99 Md.App. 60, 64, 635 A.2d 77 (1994) (stating that the "hallmark distinction" between civil and criminal contempt "is whether the sanction is coercive or punitive in nature.").

The contempt in this case was a constructive civil contempt, not a criminal contempt. The nature of the pro-

ceedings of January 16, 2004, and the substance of the January 30, 2004 order, do not support the conclusion that the court imposed a $200,000 fine against Father to punish past behavior. Father was not charged by the State's Attorney's Office with criminal contempt and the proceedings were not conducted as a criminal contempt trial. *See* Md. Rule 15–205. Accordingly, the $200,000 judgment was not a criminal contempt sanction.

The $200,000 judgment also was not a civil contempt purge amount, however. In his oral ruling from the bench on January 16, 2004, the judge hearing the contempt motion stated that he was awarding Mother $200,000 as "costs." The January 16, 2004 order implementing the court's oral ruling states that Father could purge the contempt order by submitting himself to the jurisdiction of the court, *i.e.,* by returning to Maryland with Darren. The order does not say (nor does the transcript of the ruling say) that the $200,000 was a purge amount that Father no longer would have to pay if he returned Darren to Maryland. Indeed, the order makes plain that Father could purge the contempt merely by returning to Maryland with Darren.

The court's decision at the hearing on November 5, 2004, that the January 30, 2004 judgment was a contempt fine, was legally incorrect. Moreover, the court had no authority to retroactively re-characterize the award of $200,000 in costs as a contempt fine. *Cf. Goldberg v. Miller, supra,* 371 Md. at 603, 810 A.2d 947 (stating that "[b]ecause an obligation to pay child support creates an enforceable duty of the parent, a trial court may not select, at its complete discretion, which of its orders should be deemed child support."); *Shapiro v. Shapiro,* 346 Md. 648, 665–67, 697 A.2d 1342 (1997) (holding that circuit court lacked authority to order that alimony provisions of marital settlement agreement, which had been incorporated into divorce judgment, "shall be considered child support," in the absence of fraud, mistake, or irregularity under Rule 2–535(b)). Furthermore, when made, that ruling had no legal significance in this case; it only took on meaning when the court (by another judge) was faced with the question of

whether the fees and costs Mother was seeking to recover in her December 16, 2004 motion were the same fees and costs covered by the $200,000 judgment already entered in her favor.

Even if the ruling on November 5 had been legally correct, the judge presiding over the hearing on Mother's December 16, 2004 motion would not have been bound by the prior, interlocutory ruling about the nature of the $200,000 judgment. *See Scott v. State*, 379 Md. 170, 184, 840 A.2d 715 (2004); *State v. Frazier*, 298 Md. 422, 449, 470 A.2d 1269 (1984); *Peterson v. Orphans' Court for Queen Anne's County*, 160 Md.App. 137, 170, 862 A.2d 1050 (2004). If the prior interlocutory ruling is legally incorrect, as it was here, it is an abuse of discretion for the judge subsequently in the position of applying the ruling to leave it uncorrected.

It appears from the record in this case that a large portion of the $252,930 in fees and costs that Mother was awarded by the judgment of July 28, 2005 reimbursed her for the exact same expenses that the January 30, 2004 judgment reimbursed her for. An award of counsel fees and costs under FL section 12–103 is compensatory in nature, in that it either directs payment of expenses the movant will be required to pay himself or herself, absent the award, or reimburses the movant for expenses he or she already has paid. Plainly, Father cannot be ordered to pay Mother twice for a single expense. To the extent that the $252,930 judgment duplicates the $200,000 judgment, it must be vacated. *Cf. Underwood–Gary v. Mathews*, 366 Md. 660, 785 A.2d 708 (2001) (holding that plaintiff in tort action is entitled to but one compensation for his or her loss); *Montgomery Ward & Co. v. Cliser*, 267 Md. 406, 298 A.2d 16 (1972) (same).

It is not possible for us to determine from the record precisely which expenses covered by the $200,000 judgment also were covered by the $252,930 judgment.[13] For that

---

**13.** Indeed, the parties do not agree on what precisely is covered by the $252,930 judgment. At oral argument in this Court, counsel for Mother

reason, we shall vacate the entire $252,930 judgment and remand the case to the circuit court for further proceedings to determine the extent to which the fees and costs awarded by that judgment are the same fees and costs awarded by the $200,000 judgment (and the prior $100,000 judgment); and to enter as a new judgment an award of those fees and costs the hearing court found Mother was entitled to but that were not included in the $200,000 judgment entered on January 30, 2004 (or the prior $100,000 judgment).

## VI.

*Did the circuit court improperly calculate Mother's counsel fees and costs and improperly award her counsel fees and costs that had been paid by a third party with no repayment obligation on her part?*

Finally, Father contends that Mother was not entitled to recover counsel fees and costs incurred in securing Darren's return because they were paid by her husband and she is not under an obligation to pay him back. Father also complains that the court erred by not granting him a recoupment of the $27,040 in child support payments he made to Mother while Darren was in his custody in Turkey.[14] In addition, in a footnote, Father "question[s] the enforceability" of Mother's award of counsel fees incurred by her Turkish lawyer because a CTU representative acknowledged that the lawyer claimed to have received $6,382.98 in fees, not $75,000 as alleged by Mother.

### (A)

██ According to Father, the evidence established that Benck, not Mother, paid virtually all of the expenses incurred

---

contended that that judgment does not include any attorneys' fees; counsel for Father contended that it does.

**14.** We note, as mentioned above, that Father did not willingly pay those child support amounts. They were collected against his TIAA–CREF account by means of a QDRO.

in recovering Darren from Turkey; and that Mother was under no obligation to repay Benck. Father maintains that it is "unfair" for him to be "charged with Mr. Benck's expenses."

If nothing else, this argument is notable as a fine example of chutzpah.[15] Father abducted Darren to a foreign country and refused to disclose his whereabouts or return him. If Mother ever was going to see Darren again, she had no choice but to pursue every avenue she could, both legally and outside the bounds of the law, to rescue him. For over two years, she devoted all of her time trying to gain Darren's return. She could not work to earn income and put all her efforts into securing Darren's return at the same time. Her husband supported her and, because she had no income, paid the expenses she was incurring in trying to rescue Darren. The expenses were enormous, totaling almost $400,000. Benck paid them out of money he was earning and that he and Mother had saved-all of which was marital property. As the federal bankruptcy court found, the expenses incurred in obtaining Darren's return constituted a "willful and malicious injury" inflicted by Father upon Mother.

Now, after Darren was returned to Maryland solely as a consequence of Mother's efforts, and in spite of Father's efforts to thwart that result at every turn, Father protests that the expenses that he inflicted upon Mother are somehow personal to Benck, and therefore Father should be relieved from paying them. The expenses were incurred as a direct result of Father's own reprehensible conduct, and were paid by Mother's husband because that same reprehensible conduct made it impossible for her to work and still rescue Darren.

---

**15.** "Chutzpah" is defined in *The Joys of Yiddish* as "[g]all, brazen nerve, effrontery, incredible 'guts,' presumption-plus-arrogance such as no other word, and no other language, can do justice to." Leo Rosten, The Joys of Yiddish 93 (McGraw–Hill 1968). Rosten goes on to give a classic example: "Chutzpah is a quality enshrined in a man who, having killed his mother and father, throws himself on the mercy of the court because he is an orphan." The Federal Circuit has adopted a "chutzpah doctrine." *See Marks v. Comm'r,* 947 F.2d 983, 986 (D.C.Cir.1991) (fugitives from criminal prosecution argued that inadequate efforts were made to notify them of tax delinquency).

Moreover, the income and savings that were used to pay the expenses were marital property that otherwise would have been used for the benefit of both Mother and Benck.

 The collateral source doctrine, recognized in Maryland law, provides an apt analogy here. In tort cases, the doctrine bars a culpable party whose wrongdoing has injured another party from escaping responsibility for paying damages because the injured party's expenses have been paid by a third party (such as a health insurer). *Narayen v. Bailey*, 130 Md.App. 458, 747 A.2d 195 (2000). Proponents of the doctrine reason that, without it, a guilty defendant would be relieved of liability for damages he caused, merely because the plaintiff had the foresight to obtain insurance coverage. *Id.* at 466, 747 A.2d 195 (citing Michael F. Flynn, *Private Medical Insurance and the Collateral Source Rule: A Good Bet?*, 22 U. TOL. L.REV. 39, 43–45 (1990)).

In this case, Father took Darren from Mother's lawful custody and kept him out of her custody in violation of court orders. Mother's husband, with whom she shares a household and finances, incurred tremendous expenses to obtain Darren's return. Father, as the culpable party, was ordered to repay those expenses. It would be a gross injustice for Father to escape his legal responsibility to repay those sums merely because the payments were made indirectly, by Mother's husband, and not directly, by Mother.

### (B)

 Father's recoupment argument also lacks merit. In *Rand v. Rand*, 40 Md.App. 550, 392 A.2d 1149 (1978), this Court held that, when a child support award is reversed or modified downward on appeal, the paying party has no entitlement to a recoupment of the overpayments. Only if the paying party shows that the overpayments have not been used to support the child, and the recipient parent has the overpaid sum available to repay, so that, during the recoupment period, the child will not be receiving less support than has been ordered, may the court exercise its discretion to grant a

recoupment award. We emphasized that the right to child support is a function of legal policy and not a matter of private contract rights.

■ In the case at bar, recoupment was unavailable to Father. Father did not challenge the amount of child support awarded by the circuit court. Thus, there has never been a determination by an appellate court that the child support award was excessive, or should not have been made at all, so as to give rise to a claim for recoupment. In addition, Father did not introduce any evidence to show that Mother has the funds available to repay the child support award. Indeed, the evidence adduced at the hearing established the contrary. Therefore, the circuit court properly denied Father's claim for recoupment.

## (C)

■ Lastly, the factual findings by the trial court do not support Father's footnote argument about the Turkish lawyer's fees.

Donald M. Feeney, Jr., one of the owners of CTU, testified that CTU paid the Turkish lawyer approximately $75,000 for legal services rendered in the Hague Convention case and for legal advice generally. On cross-examination, Feeney acknowledged that the Turkish lawyer had said that he received only $6,382.98 in fees from CTU. Apparently, the Turkish lawyer's representation was made to Turkish officials. Feeney explained that the lawyer was and remains "in a position that he has to be very careful what he says. He's still in danger at this time.... He is not ... out of the woods yet. He has been threatened. His office has been broken into...." The Turkish lawyer had told Feeney that he was absolutely convinced that the break-in was connected to his work on Darren's case.

In his oral ruling on Mother's motion, the hearing judge made factual findings. He recounted that Feeney implied in his testimony that the Turkish lawyer "claim[ed] he only got paid $6,000 ... kind of to cover his own hide in dealing with

Turkish officials." The judge said that he had "no reason to question the credibility of [Feeney]. The man has fought for the United States of America as a Green Beret, a member of the Delta Force, all of which are highly selective and highly trained individuals."

The hearing court thus found that CTU in fact paid the Turkish lawyer the amount Feeney said CTU had paid, and the amount Mother was billed, not the $6,382.98 the Turkish lawyer said he was paid "to cover his own hide." Accordingly, there is no basis to Father's assertion that any award to Mother of more than $6,382.98 for the Turkish lawyer's fee is not enforceable.

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE–HALF BY THE APPELLANT AND ONE–HALF BY THE APPEL-LEE.**