*Jocelyn P. v. Joshua P.*
No. 561, Sept. Term 2022
Opinion by Leahy, J.

**Family Law > Disposition of Pre-Embryos > Blended Contractual/Balancing Approach > Oral Agreement**

Maryland courts, when resolving a dispute as to the disposition of a frozen pre-embryo between the progenitors, look first to determine whether a prior agreement between the progenitors controls the disposition of the pre-embryos at stake. *Jocelyn P. v. Joshua P.*, 250 Md. App. 435, 486-87 (2021). Here, the evidence demonstrated that the parties formed an oral agreement before pursuing in-vitro fertilization "that IVF was, in fact, creating life, and that if we were going to go ahead and do this IVF procedure, that *no matter what*, we would give every embryo the chance to be used." (Emphasis added). The "construction of an oral contract, whose terms are undisputed, like that of a written contract, is a matter for the Court to whom the law confides the interpretation of all contracts[.]" *Marr v. Langhoff*, 322 Md. 657, 667 (1991) (quoting *Am. Towing & Lightering Co. v. Baker-Whitely Coal Co.*, 111 Md. 504, 522 (1909)).

**Family Law > Disposition of Pre-Embryos > Oral Agreement > Plain Language**

The unrefuted testimony of Jocelyn—as well as Joshua's direct acknowledgement that the parties "agree[d] to give all the embryos a chance at life"—establishes that the parties agreed to undergo IVF with the clear understanding that "*no matter what*, [they] would give every embryo the chance to be used." In giving effect to the parties' agreement, under the objective theory of contracts, we consider "what a reasonable person in the position of the parties would have meant at the time [the oral agreement] was effectuated." *Marr v. Langhoff*, 322 Md. 657, 667 (1991) (quoting *Herget v. Herget*, 319 Md. 466, 470 (1990)). We see no reason why an agreement to "give all of the embryos a chance at life" "no matter what" would not, viewing the terms objectively, encompass the contingency of divorce.

**Family Law > Disposition of Pre-Embryos > Oral Agreement > Post-Hoc Condition**

The circuit court based its ruling in favor of Joshua on the premise that the parties' agreement was confined to "being married and having and raising children together." We conclude that the court's interpretation is contrary to the plain terms of the agreement and introduces a limitation into the parties' oral agreement to which they never actually agreed. Under the objective theory of contracts, we consider "what a reasonable person in the position of the parties would have meant at the time [the oral agreement] was effectuated." *Marr v. Langhoff*, 322 Md. 657, 667 (1991). We do not discern an agreement to "give all of the embryos a chance at life" "no matter what" to encompass the limitation that the agreement apply only to the circumstance that the parties are "married and having and raising children together."

Circuit Court for Baltimore County
Case No. 03-C-17-007803

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 0561

September Term, 2022
_____

JOCELYN P.

v.

JOSHUA P.
_____

Leahy,
Zic,
Kehoe,**

JJ.
_____

Opinion by Leahy, J.
_____

Filed: September 6, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

*Kehoe, Cristopher B., now retired, participated in the hearing of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of this opinion.

**Friedman, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

"Promises are the uniquely human way of ordering the future, making it predictable and reliable to the extent that this is humanly possible."[1]

-Hannah Arendt

This case returns to us on appeal from an order entered by the Circuit Court for Baltimore County, Maryland, determining the disposition of a pre-embryo generated through the process of *in vitro fertilization* ("IVF").[2] The parties, Jocelyn P. ("Jocelyn")

---

[1] HANNAH ARENDT, CRISES OF THE REPUBLIC: LYING IN POLITICS, CIVIL DISOBEDIENCE, ON VIOLENCE, THOUGHTS ON POLITICS AND REVOLUTION, 92-93 (Harcourt Brace & Co. 1972).

[2] The term "embryo" is used interchangeably by courts and legal writers with multiple other terms, including "pre-embryo," "pre-zygote," and "zygote." *See* Laura S. Langley & Joseph W. Blackston, *Sperm, Egg, and a Petri Dish Unveiling the Underlying Property Issues Surrounding Cryopreserved Embryos*, 27 J. LEGAL MED. 167, 170 (2006); *see also* Susan L. Crockin & Gary A. Debele, *Ethical Issues in Assisted Reproduction: A Primer for Family Law Attorneys*, 27 J. AM. ACAD. MATRIM. LAWS. 289, 298 (2015) ("The vocabulary surrounding pre-implantation IVF embryos has engendered heated legal, bioethical, religious, and policy debates . . . This article strives to use the medically accurate description of 'pre-implantation IVF embryo' . . . signifying an entity formed from an egg and a sperm outside the body that has not yet been transferred to a location for the purpose of implantation and pregnancy[.]"). In *Jocelyn I*, we joined the majority of state appellate courts in adopting the term "pre-embryo" to describe an egg that is fertilized and cryogenically preserved outside the womb.

Although the term "embryo" was used in the IVF Contract and employed by the trial court and the parties during the underlying proceedings, the majority of state appellate courts that have addressed these issues employ the term "pre-embryo." *See In re Marriage of Rooks*, 429 P.3d 579, 582 (Colo. 2018) ("'Pre-embryo' is a medically accurate term for a zygote or fertilized egg that has not been implanted in a uterus. . . . An embryo proper develops only after implantation." (citation omitted)); *Unruh-Haxton v. Regents of University of California*, 76 Cal. Rptr. 3d 146, 152 n. 3 (2008) *as modified* (May 15, 2008) ("An egg fertilized inside a woman's body is an embryo, and an egg fertilized outside a woman's body is commonly referred to as a pre-embryo"); *J.B. v. M.B.*, 783 A.2d 707, 708 n. 1 (N.J. 2001) ("A pre[-]embryo is a fertilized ovum (egg cell) up to approximately

(Continued)

and Joshua P. ("Joshua"), resorted to the IVF process during the course of their marriage after they attempted, unsuccessfully, to conceive a child by natural means. The couple managed to produce three viable pre-embryos for uterine implantation after Jocelyn gave up her job and endured years of emotional and physical pain and suffering. The implantation of the first pre-embryo resulted in a miscarriage, while implantation of the second happily culminated in the birth of the parties' first child, F.P. Unfortunately, after F.P.'s birth, Jocelyn and Joshua's relationship deteriorated and the parties ultimately sought dissolution of the marriage. After agreeing to settlement terms on all other matters, the fate of the parties' third pre-embryo—which Jocelyn desires to use for implantation and Joshua desires to destroy—remained in dispute.

In the parties' first appeal, we vacated the circuit court's initial order awarding the pre-embryo jointly to the parties until they could reach an agreement. *Jocelyn P. v. Joshua P.*, 250 Md. App. 435 (2021) ("*Jocelyn I*"). We held, as a matter of first impression, that trial courts should "first look to the preference of the progenitors in any prior agreement expressing their intent" when determining the disposition of pre-embryos upon the dissolution of a marriage or partnership. *Id.* at 446 (cleaned up). However, due to the

---

fourteen days old (the point when it implants in the uterus). Throughout this opinion, we use the term 'pre[-]embryo,' rather than 'embryo,' because pre[-]embryo is technically descriptive of the cells' stage of development when they are cryopreserved (frozen)." (citing *The American Heritage Stedman's Medical Dictionary* 667 (1995)); *see also Bilbao v. Goodwin*, 217 A.3d 977 (Colo. 2019); *In re Marriage of Fabos & Olsen*, 451 P.3d 1218 (Conn. 2019); *Szafranski v. Dunston (Szafranski II)*, 34 N.E.3d 1132, 1157 (Ill. 2015). Barring direct quotation, we continue to use the term "pre-embryo" in this narrow context in this opinion.

proliferation of "third-party informed consent agreements," we cautioned "that the progenitors—not fertility centers—must expressly and affirmatively designate their own intent" and that "boilerplate language in third-party form contracts that lack expression or direction from the progenitors will not qualify as an express agreement for this purpose." *Id.* at 447. In the absence of an express agreement, we directed that trial courts should proceed to balance the interests of the parties utilizing the factors crafted by the Supreme Court of Colorado in *In re Marriage of Rooks*, 429 P.3d 579, 593-94 (Colo. 2018):

> (1) the intended use of the frozen pre-embryos by the party seeking to preserve them; (2) the reasonable ability of a party seeking implantation to have children through other means; (3) the parties' original reasons for undergoing IVF, which may favor preservation over disposition; (4) the potential burden on the party seeking to avoid becoming a genetic parent; (5) either party's bad faith and attempt to use the frozen pre-embryo as leverage in the divorce proceeding; and (6) other considerations relevant to the parties' unique situation.

*Jocelyn I*, 250 Md. App. at 446-47.

Because "Jocelyn presented evidence of an oral agreement between the parties," we remanded the case for the circuit court to consider "whether the oral agreement controls the outcome in this case" and, "if necessary, balance the interests of the parties" in accordance with the *Rooks* factors. *Id.* at 493-94, 496. On remand, the circuit court took additional testimony and entered a memorandum opinion and order (1) finding that the parties' oral agreement only contemplated disposition of the pre-embryos during their marriage, and (2) awarding the pre-embryo to Joshua after balancing the parties' interests. Jocelyn noted a timely appeal from that order and presents two questions for our review:

3

I. "Did the trial court err in finding the parties' prior oral agreement regarding the disposition of their frozen pre-embryo only contemplated the parties being married and raising children together?"

II. "Did the trial court err in balancing the interests of the parties to determine which party must be awarded the parties' cryogenically preserved pre-embryo conceived through IVF?"

We hold that the trial court erred in finding that the parties' prior oral agreement did not control the disposition of the parties' remaining pre-embryo. While Jocelyn and Joshua certainly contemplated using all of the pre-embryos within the confines of an intact marriage, Jocelyn has testified consistently that they both agreed to give each pre-embryo an opportunity to be born "no matter what." Joshua—who testified after Jocelyn—did not testify to having placed any limitations or conditions on that unequivocal mandate and acknowledged that they had "agree[d] to give all the embryos a chance at life." In reliance on that agreement, and as consideration thereunder, Jocelyn:

- Underwent a surgical procedure to remove eggs from her uterus;
- As a result of the hormone injections required to prepare for that procedure, suffered, among other things, thinning hair and significant weight gain;
- Experienced the trauma of a miscarriage during the parties' first attempt to bear a child; and
- Attended "hundreds" of medical appointments and shifted to part-time work to accommodate that grueling schedule.

The circuit court, in reaching its decision, relied entirely on Joshua's testimony that the parties did not specifically discuss giving the pre-embryos a chance at life outside their marriage. The court's holding, therefore, added a qualifier to the parties' clear oral agreement—*i.e.*, to give each pre-embryo a chance at life, no matter what, *except in the event of divorce*—to which Jocelyn and Joshua never actually agreed. We cannot, under

4

an objective theory of contract interpretation, accede to the court's revision of the parties' oral agreement.

Our conclusion with respect to the existence of the oral agreement between Jocelyn and Joshua is dispositive of this appeal because, under the blended contractual/balancing of interests approach, we "first look to the preference of the progenitors in any prior agreement expressing their intent" before proceeding to balance the parties' interests. *Jocelyn I*, 250 Md. App. at 446 (cleaned up). Accordingly, we do not reach Jocelyn's contentions of error regarding the circuit court's balancing of the parties' interests.[3]

## BACKGROUND

Jocelyn and Joshua married in July of 2010 and shortly thereafter began their efforts to conceive a child together. *Jocelyn I*, 250 Md. App. at 448. After two years without success, they turned to Shady Grove Fertility Reproductive Science Center ("Shady Grove"), where Jocelyn underwent testing and "was diagnosed with (1) '[p]rimary

---

[3] We observe, however, that the court's application of the *Rooks* factors is troubling in regard to: Factor 1, insofar as the court proceeded beyond the considerations appropriate for this factor; Factor 2, in giving so much weight to Joshua's interest in destroying the pre-embryo over Jocelyn's inability to achieve pregnancy through any other reasonable means and the immense level of physical and emotional sacrifice that she invested in the pre-embryo; and, Factor 3, by failing to consider the parties' original intent to give each pre-embryo a chance at life "no matter what." Despite our clear instructions in *Jocelyn I*, the court failed to consider Jocelyn's testimony that the parties had agreed to give every pre-embryo a chance at life, a point which we instructed was "directly relevant to the third factor regarding the parties' original reasons for undergoing IVF." *Jocelyn I*, 250 Md. App. at 496. On remand, the circuit court failed to even mention Jocelyn's testimony in analyzing the third factor and concluded that "[t]he parties' original reason to pursue IVF was to achieve their goal of having a family and having children jointly as a married couple." The record also establishes that the disparity in the parties' efforts to produce the pre-embryo in question was considerable, and that at Jocelyn's age, the remaining pre-embryo effectively represents her last chance of having another biological child.

infertility' and (2) '[p]ossible unexplained infertility.'" *Id.* (alterations in original). Thereafter, in 2013, Jocelyn and Joshua elected to pursue their hopes of achieving pregnancy through intrauterine insemination ("IUI").[4] *Id.* Jocelyn underwent three IUI procedures in September, November, and December 2013, all of which were unsuccessful. *Id.*

From there, Jocelyn and Joshua consulted with the Fertility Center of Maryland ("FCM") to further assess their situation. Jocelyn, after additional testing, "underwent a hysteroscopy, dilation, and curettage procedure to increase her chance of pregnancy." *Id.* at 448-49. She then "underwent four additional IUI procedures between April and June, 2015." *Id.* at 449. Unfortunately, none of the IUI procedures resulted in pregnancy. *Jocelyn I*, 250 Md. App. at 449.

All parties agreed that this process exacted a toll on Jocelyn because the "IUI procedures were accompanied by numerous doctor visits, blood draws and tests, ultrasounds, and shots of hormones to increase egg production and prompt ovulation." *Id.* at 448. Jocelyn later described the IUI process as causing "internal gut[-]wrenching pain. Just like – like you got kicked in the gut really hard but from the inside" and noted that "the hormones were just awful to go through." *Id.* at 455. She also "related that the failure to conceive was 'absolutely devastating'" and that she was "sometimes visiting the 'doctor's office three times a day.'" *Id.*

---

[4] IUI "is a fertility treatment that involves the 'placement of sperm that have been washed of seminal fluid directly into the uterus to bypass the cervix.'" *Jocelyn I*, 250 Md. App. at 448 n.4 (quoting *Stedman's Medical Dictionary Online*, intrauterine insemination (2021)).

## The IVF Process and Agreements

After seven unsuccessful IUI procedures, Jocelyn and Joshua decided to pursue pregnancy through IVF and executed an agreement with FCM on September 10, 2015 (the "FCM Agreement").[5]  *Jocelyn I*, 250 Md. App. at 449.  Section A.2.c. of the FCM Agreement, titled "Ownership and Disposition of Frozen Embryos," provided, in relevant part, as follows:

> I/we (The Couple) understand and agree that if any dispute arises between the two of us regarding disposition of the embryos, FCM is authorized, in its sole discretion, to refrain from taking any action unless and until otherwise directed by a final judgment of a court of competent jurisdiction or by another agreement signed by both partners. We agree to be jointly and individually responsible for the storage fees. FCM is entitled to rely on future written agreements provided by us, and shall have no obligation to inquire as to their validity or enforceability.
>
> I/we understand and agree the FCM, in its sole discretion, may institute legal proceedings of any kind regarding the disposition of the embryos. If and in that event, this [IVF Contract] shall be governed by the laws of the State of Maryland.

*Id.* at 450 (cleaned up).

Additionally, under the FCM Agreement, Jocelyn and Joshua were given the opportunity to determine the disposition of their pre-embryos in the event of death or incapacity "of one of us." *Id.* at 451 (cleaned up).  Jocelyn and Joshua "both entered their initials indicating their desire that the frozen pre-embryo would '[b]ecome the property of

---

[5] In contrast to IUI, which seeks to achieve fertilization of an egg by direct placement of sperm into the uterus, IVF is "a process whereby (usually multiple) ova are placed in a medium to which sperm are added for fertilization, the zygote thus produced then being introduced into the uterus with the objective of full-term development." *Jocelyn I*, 250 Md. App. at 449 n.5 (quoting *Stedman's Medical Dictionary Online,* in vitro fertilization (2021)).

the (other) surviving partner who will have full authority regarding disposition which may include storage, disposal or use to establish a pregnancy.'" *Id.* (alteration in original).

Lastly, regarding the storage of the pre-embryos, the FCM Agreement specified that, if the "embryo(s) have been in storage for five (5) years, it is the policy of FCM that the disposition of the frozen embryos should occur at that time" and required that the "Couple agree[] to make a determination before the expiration of the five (5) years of storage plan." *Id.* The Agreement further provided:

> The Couple understands that FCM will provide them with a thirty (30) days advance notice that the five (5) years has elapsed[.] **If I/we do not respond or cannot be contacted, FCM is hereby authorized to discard any remaining frozen embryos according to laboratory procedure.**

*Id.* (emphasis in original).

After signing the FCM Agreement, Jocelyn underwent a procedure, known as an "oocyte retrieval[,]" to remove eggs from her ovaries on September 16, 2015. *Jocelyn I*, 250 Md. App. at 451. The procedure was successful, with fourteen oocytes being retrieved, eight being fertilized, and three developing into viable pre-embryos. *Id.* As previously noted, the first pre-embryo was implanted successfully, but resulted in a miscarriage in October 2015. *Id.* The second pre-embryo was also implanted in Jocelyn's uterus and culminated in the birth of Jocelyn and Joshua's son, F.P., in September 2016. *Id.*

The third pre-embryo was transferred to frozen storage at Fairfax Cryobank, Inc. ("Cryobank"), in Fairfax, Virginia on June 1, 2020. *Id.* at 451-52. The Storage Agreement with Cryobank, which the parties agreed superseded the FCM Agreement at oral argument in their first appeal, provided that Cryobank would store the parties' remaining pre-embryo

according to "applicable law and its standard policies and procedures[,]" and that it would terminate upon the non-payment of storage fees by Jocelyn and Joshua.[6] *Id.* at 461-63.

## Divorce Proceedings and First Hearing

In 2017, Jocelyn and Joshua's relationship grew contentious, culminating in a heated argument requiring police intervention. *Jocelyn I*, 250 Md. App. at 452. Jocelyn left the marital home and obtained a protective order against Joshua, which was later reversed following a hearing in the Circuit Court for Baltimore County. *Id.* Jocelyn then

---

[6] The form Storage Agreement with Cryobank, which, of course, was not entered into until after the parties initiated the underlying litigation, also provided, in a section titled "Disposition of Embryos Upon Death or Divorce]":

> Clients have reached a mutual decision and are in agreement about the disposition of the Embryos in certain circumstances, as provided below, and Clients acknowledge that Cryobank will require no additional notice, consent, waiver or instructions in complying with the following:
>
> 6.1 In the event of the death of one Client, as evidenced by a certified copy of the death certificate, the surviving Client will have ownership and control of the Embryos stored with Cryobank.
>
> 6.2 In the event of the death of both Clients, the Embryos will be disposed of by thawing with no further action, which will render the Embryos permanently and irretrievably unusable for any purpose.
>
> 6.3 In the event of legal separation or divorce of the Clients, ownership and control of the Embryos stored with Cryobank are to be specified in a divorce decree or other legally binding document, a certified copy of which will be provided to Cryobank. Absent such documentation, ownership will remain with both Clients.
>
> 6.4 Clients may change these instructions in the future only by providing Cryobank with new written instructions bearing the notarized signatures of both individuals.

*Id.* at 462 (cleaned up).

filed a complaint for limited divorce in the circuit court, in response to which Joshua answered and filed a counter-complaint for limited divorce. *Id.* The parties later amended their pleadings to seek absolute divorce. *Id.* On May 29, 2019, Jocelyn and Joshua entered a settlement on the record disposing of all issues except "what to do with the third pre-embryo that was cryopreserved." *Id.*

On July 29, 2019, the circuit court held an evidentiary hearing to address the parties' dispute over the status of the remaining pre-embryo. *Id.* at 454-55. Jocelyn testified first and explained the parties' hesitance to resort to IVF due to their shared religious belief that life begins at conception. *Jocelyn I*, 250 Md. App. at 455. Before undergoing IVF, Jocelyn noted that she and Joshua discussed "at length beforehand . . . before we went through this procedure, that we agreed that every single embryo would be used because we create[d] a life and it was our responsibility to give that embryo the opportunity of life." *Id.* at 456.

With respect to the IVF process, Jocelyn described it as "awful." *Id.* at 456. She explained that her hair fell out, she gained thirty pounds, and developed "awful" gout pain in her toe. *Id.* Jocelyn also explained that the IVF process consumed her time as she had "hundreds" of medical appointments. *Id.* Ultimately, the demand of the fertility treatments forced Jocelyn to shift to a part-time work schedule "because there was no way that [she] could have worked full-time. . . . [She] couldn't keep [her] job." *Id.* (alterations in original).

Finally, although conceding that she had the physical ability to produce eggs and could "potentially" go through IVF again, Jocelyn explained:

> [F]rom a religious standpoint[,] I don't want to go through IVF again. I would then be creating more life with potentially not enough time to use the

embryos that I created because I'm just older. So there is no guarantee that it would work again. And I don't want to go through that again. It was awful.

*Jocelyn I*, 250 Md. App. at 456-57, 459 (alterations in original).

Joshua testified next and noted that the parties did not discuss the possibility of divorce before deciding to proceed with IVF. *Id.* at 457. He stated that his concerns with Jocelyn using the remaining pre-embryo were "her health, the potential fetus's health given [her] age" as well as "financial responsibility and access of being a parent." *Id.* Joshua emphasized that the parties already had a strained relationship and difficulties in co-parenting, which had resulted in him being given uneven access and visitation with F.P. *Id.* He opined, "I think given our current situation with access and parenting rights on my part, I believe it would just be a repeat offense, that I would be withheld time from that potential child." *Id.*

With respect to disposition, Joshua's stated preferences fluctuated throughout the course of the hearing. At first, he testified that he desired the pre-embryo to "either be destroyed or potentially donated for use by a needy family with both of us giving away our parental rights to it." *Id.* at 458. However, he clarified that he had conversations with Jocelyn in which he professed a preference for donation over destruction "to satisfy our religious take on this situation[.]" *Jocelyn I*, 250 Md. App. at 458. Ultimately, Joshua's main goal was that Jocelyn "doesn't have use and we don't have responsibility" and he clarified that if "it comes down to use or destruction, I choose destruction" even if his parental responsibilities could be eliminated. *Id.* In a colloquy with the court, Joshua explained as follows:

11

THE COURT: So as I understand it, one of your big concerns, you want to be relinquished of the rights and responsibilities if this embryo is born? Is that true?

[JOSHUA]: No, Your Honor.

THE COURT: No?

[JOSHUA]: It goes much deeper than that.

THE COURT: That is part of it?

[JOSHUA]: That is part of it. But it comes down to it is half her; it is half me. We are not together anymore.

THE COURT: Right.

[JOSHUA]: We are no longer a couple and we will not be having a family. Therefore, whenever we made that embryo via science at Fertility Center of Maryland, followed with Capital Women's Care, caring for, you know, the child rearing portion of that, beyond that, this current embryo is, no, sir, I could not want it [to be] used.

THE COURT: So you don't want it used even if you were -- if all responsibility and all rights were -- if your parental rights and parental responsibilities somehow could be eliminated through this embryo, you still wouldn't want Miss [P.] to have use of it?

[JOSHUA]: That's correct.

THE COURT: Because?

[JOSHUA]: Because we all know it is 50/50 mine and hers. And that child -- I would always know --

THE COURT: **But you wouldn't mind another couple having the embryo?**

[JOSHUA]: **Potentially. Allow me to clarify. At this point [Jocelyn P.'s counsel], the question you asked me, Your Honor, I choose destruction.**

(Emphasis added).

12

Finally, Jocelyn testified on rebuttal, in reply to a question from the court as to her intended use of the pre-embryo, as follows:

> I would like to have another child. That is my baby. The fertility process was absolutely horrible. I gave up my career. I gave up my time. I gave up my health. And it is the same thing . . . . The one thing that I wanted since I was a little kid was to be a Mom. And to be told that I couldn't be and that I had to go through this process. And I did. And I worked so hard at it. I went to every single appointment. He didn't go to all of the [medical] appointments. There were times I was there three times a day and I would go home and take him the cup, so he would give a sample and come back.
>
> I sacrificed so much of my life and my time for this child. And I have a beautiful child who is amazing. But my intent, and I promised myself before I started the IVF process, was to give every single child that I created a chance at life. Because if I'm going to create life, it is my responsibility to take care of it. And I want to have that other baby. I don't have any issues supporting myself.

*Id.* at 458-59.

### Joint Award

On November 20, 2019, the circuit court entered a memorandum opinion and order awarding the pre-embryo to the parties jointly until they reach a final agreement. Recognizing the matter as one of first impression in Maryland, the circuit court summarized and applied the three prevailing approaches to determining disputes over pre-embryos in the event of a divorce or separation: (1) the contractual approach, (2) the contemporaneous mutual consent approach, and (3) the balancing test. *Jocelyn I*, 250 Md. App. at 459.

Under the contractual approach, the circuit court found that the FCM Agreement "was unambiguously a 'binding contract' which 'controls the ... disposition of embryos which are frozen during an IVF cycle at FCM.'" *Id.* In particular, the court placed

13

significant weight on Section A.2.c. of the contract, which provided that "[i]t is the policy of FCM that embryos produced by the joining of eggs and sperms are subject to disposition in a manner mutually agreed upon by the partners." *Id.* The court also recognized that the FCM Agreement did not determine the outcome in the event of divorce "when both parties are gamete providers[.]" *Id.* (alteration in original). Accordingly, the court held that the parties' "unambiguous contract is enforceable, and the disposition of the embryo requires mutual consent of the parties." *Id.* at 459-60.

Next, in applying the contemporaneous mutual consent approach, the circuit court explained that "if mutual consent cannot be achieved the status quo is preserved in the hopes that the parties may reach an agreement at some later time." *Id.* at 460. Because the parties were deadlocked, the court found that the "embryo is to remain frozen until the parties agree on a disposition." *Jocelyn I*, 250 Md. App. at 460.

Finally, under the balancing test, the circuit court, loosely applying the *Rooks* factors, found:

> Neither party in this case seeks to donate the embryos, therefore the parties are on equal footing regarding the first factor. Regarding the second factor, while [Jocelyn] was assessed to be infertile without the aid of IVF, she produced a child through IVF in the past and testified that she is physically capable of repeating the process. . . . No evidence in the form of expert testimony, or otherwise, was produced showing that she is incapable of having biological children through any means other than the implantation of the embryo.

> Regarding the third factor, IVF was not pursued to preserve either part[y's] individual ability to have children in the face of fertility implicating medical treatment, rather the parties' original reason for undertaking IVF was to have children jointly as a married couple. . . .

Regarding the fourth factor, the hardship for [Joshua] includes the typical hardships of unwanted parenthood. Moreover, [Joshua] already shares a child with [Jocelyn] and testified to difficulties in co-parenting. . . . Regarding the fifth factor, there is no evidence of bad faith or any attempt by either parent to use the embryo as unfair leverage in the divorce proceedings.

*Id.* at 460-61.

Accordingly, the court stated that, applying any of the approaches, "there is no outcome that permits implantation of the embryo against [Joshua's] wishes." *Id.* at 461 (alteration in original). Then, the court ordered that "the frozen embryo should be awarded jointly to the couple, maintaining the status quo, with the parties sharing all expenses associated with storage until mutual consent is reached." *Id.*

## First Appeal

Jocelyn noted a timely appeal and we vacated the judgment of the circuit court in a reported opinion. Agreeing with the parties that the issue was one of first impression in Maryland, we surveyed the leading approaches adopted by our sister states in resolving these types of disputes. Ultimately, we concluded that "disputes that arise during dissolution of the parties' marriage or partnership involving the custody of cryogenically preserved pre-embryos should be resolved utilizing a blended contractual/balancing-of-interests approach[.]" *Jocelyn I*, 250 Md. App. at 486 (citations omitted).

We commenced, however, by explaining the parties' equal and coextensive rights in the realm of procreative liberty. We explained:

Jocelyn and Joshua's "competing interests in the disputed pre-embryo[ ] derive from constitutional rights in the realm of reproductive choice." *In re Marriage of Rooks*, 429 P.3d 579, 586 (Colo. 2018). At its core, reproductive autonomy "is composed of two rights of equal significance—the right to

15

procreate and the right to avoid procreation." *Davis v. Davis*, 842 S.W.2d 588, 601 (Tenn. 1992).

The Supreme Court of the United States has recognized that procreation is a "basic civil right" and that "[m]arriage and procreation are fundamental to the very existence and survival of the race." *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). In articulating the fundamental right to privacy grounded in the Constitution, the Supreme Court has acknowledged an individual's personal interest in procreation: "If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). Mirroring the right to procreate, the Supreme Court has recognized the authority of an individual to *avoid* procreation. In its landmark decision in *Griswold v. Connecticut*, the Court held that a Connecticut law banning the use of contraception unconstitutional because the law intruded on the fundamental right of marital privacy. 381 U.S. 479, 485-96, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

*Id.* at 465-66 (emphasis in original).

Due to those fundamental interests, we concluded that the parties' frozen pre-embryo "cannot be classified simply as an interest in property because it concerns interests of far broader dimension." *Id.* at 466-67. We observed that "pre[-]embryos are not, strictly speaking, either 'persons' or 'property,' but occupy an interim category that entitles them to special respect because of their potential for human life." *Id.* at 468 (quoting *Davis*, 842 S.W.2d at 597). We therefore concurred with "those courts that recognize the special respect due cryopreserved pre-embryos in light of their potential for human life as well as the fundamental and coextensive rights of their progenitors to decide 'whether to bear or beget a child.'" *Id.* (quoting *Eisenstadt*, 405 U.S. at 453).

Next, we identified, traced, and analyzed the strengths and shortcomings of the three leading approaches governing disputes over pre-embryos: (1) the contractual approach, (2)

16

the contemporaneous mutual consent approach, and (3) the balancing test. *Jocelyn I*, 250 Md. App. at 468-86.

Under the contractual approach, courts look first "to any prior agreements between the parties regarding the disposition of cryopreserved pre-embryos[,]" *Id.* at 469 (quoting *Reber v. Reiss*, 42 A.3d 1131, 1134 (Pa. Super. Ct. 2012), with the understanding that "[a]greements between progenitors, or gamete donors, regarding disposition of their pre-zygotes should generally be presumed valid and binding, and enforced in any dispute between them." *Id.* (quoting *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998)). Proponents of the contractual approach stressed that it "minimize[s] misunderstandings and maximize[s] procreative liberty by reserving to the progenitors the authority to make what is in the first instance a quintessentially personal, private decision[,]" *Id.* at 474-75 (quoting *Kass*, 696 N.E.2d at 180), while incentivizing "serious discussion between the progenitors in advance of divorce[.]" *Id.* (citing *Bilbao v. Goodwin*, 217 A.3d 977, 984 (Conn. 2019)). Detractors, however, emphasized that the contractual approach "binds individuals to previous obligations, even if their priorities or values change." *Id.* at 475 (quoting *In re Marriage of Witten*, 672 N.W.2d 768, 777 (Iowa 2003).

With regard to the contemporaneous mutual consent approach, we noted that courts look to the parties' current preferences, thereby allowing a party to "'change his or her mind about disposition up to the point of use or destruction of any stored embryo,' regardless of any prior agreement." *Jocelyn I*, 250 Md. App. at 476-77 (quoting *Witten*, 672 N.W.2d at 782). We observed that proponents of this approach—which had been adopted by only a minority of jurisdictions—emphasized that it "'leaves this highly

personal choice in the hands of donors . . . and allows for a person to withdraw from an agreement that 'no longer reflects his or her current values or wishes.'" *Id.* at 477 (quoting *In re Marriage of Rooks*, 429 P.3d 579, 596 (Colo. 2018) (Hood, J., dissenting); *see also Witten*, 672 N.W.2d at 777, 783). Critics, however, have cast the approach as "'totally unrealistic' because, '[i]f the parties could reach an agreement, they would not be in court[.]'" *Id.* at 478 (alterations in original) (quoting *Reber*, 42 A.3d at 1135).

Finally, we noted that the balancing approach is used primarily "as a second step, only to be employed after it is determined that no enforceable agreement between the progenitors exists and, thus, that the contractual approach does not resolve the issue." *Jocelyn I*, 250 Md. App. at 485 (footnote omitted) (quoting *Bilbao*, 217 A.3d at 985). We explained that, at its core, the balancing approach seeks to weigh "two aspects of procreational autonomy—the right to procreate and the right to avoid procreation" along with the positions of the parties, the significance of their interests, and the relative burdens that will be imposed by differing resolutions. *Id.* at 480 (quoting *Davis*, 842 S.W.2d at 603). Although proponents point to the flexibility of the balancing test in assessing the particular equities of each case, we noted that detractors focus on the potential issues caused by courts having to "mediate a fundamentally personal decision and, in the process, infringe on a litigant's constitutional rights." *Id.* at 486 (quoting *Rooks*, 429 P.2d at 596 (Hood, J., dissenting)).

Ultimately, we concluded that a blended contractual/balancing-of-interests approach was the most consistent with Maryland law. We therefore directed that trial courts, when resolving a dispute between progenitors, should look first to determine

18

whether a prior agreement between the progenitors controls the disposition of the pre-embryos at stake. *Jocelyn I*, 250 Md. App. at 486-87. When interpreting such agreements, however, we cautioned that:

> . . . . courts should take particular care to ensure that it manifests the progenitors' actual preferences. Given the pervasiveness of third-party informed consent agreements, we emphasize that the progenitors—not fertility centers—must expressly and affirmatively designate their own intent. *See Szafranski v. Dunston (Szafranski II)*, 393 Ill. Dec. 604, 34 N.E.3d 1132, 1157 (Ill. App. Ct. 2015) (analyzing cases where "courts have found a couple's dispositional intent to have been expressed in an IVF-related agreement"). Boilerplate language in a third-party form contract may not qualify as an express agreement between progenitors regarding who should have custody of their jointly created pre-embryo in the event of the dissolution of their relationship.

*Id.* at 487 (cleaned up) (some citations omitted).

Accordingly, in the absence of any express agreement manifesting the parties' intent, we directed that the trial courts should balance the parties' interests pursuant to the factors identified by the Colorado Supreme Court in *Rooks*: "(1) the intended use of the frozen pre-embryos by the party seeking to preserve them; (2) the reasonable ability of a party seeking implantation to have children through other means; (3) the parties' original reasons for undergoing IVF, which may favor preservation over disposition; (4) the potential burden on the party seeking to avoid becoming a genetic parent; (5) either party's bad faith and attempt to use the frozen pre-embryo as leverage in the divorce proceeding; and (6) other considerations relevant to the parties' unique situation." *Id.* at 446-47 (citing *Rooks*, 429 P.3d at 593-94). Additionally, we instructed the trial courts to avoid analyzing the three "improper considerations" identified in *Rooks*: (1) the financial and economic circumstances of the party wishing to procreate; (2) the existing number of children, at

least as a standalone reason for denying preservation or use of the pre-embryo; and (3) the possibility of adoption as an alternative to genetic parenthood. *Id.* at 485-86 (citing *Rooks*, 429 P.3d at 594-95).

With that framework settled, we held that the FCM Agreement did not "indicate the parties' preferences in the event of divorce" because the Agreement provided that FCM would "refrain from taking any action **unless and until otherwise directed by a final judgment of a court of competent jurisdiction or by another agreement signed by both partners**." *Id.* at 491-93 (emphasis in original). We explained that the circuit court erred in interpreting the contract "as requiring mutual agreement between Joshua and Jocelyn" especially considering that the language requiring mutual consent "was drafted unilaterally by FCM, and there was no testimony of any opportunity by the progenitors to bargain concerning its terms." *Id.* at 492-93 (citations omitted). Thus, by interpreting the FCM Agreement as requiring "the parties to mutually agree when they cannot, the trial court, in effect, decided in favor of Joshua's recent preference that Jocelyn 'doesn't have use' of the frozen pre-embryo." *Jocelyn I*, 250 Md. App. at 493. Accordingly, we concluded that the FCM Agreement did not manifest Jocelyn's and Joshua's intent prior to the time of their separation and thus did not control. *See id.* However, because Jocelyn presented uncontradicted evidence of an oral agreement between the parties, we ordered that the circuit court "should consider on remand whether the oral agreement controls the outcome in this case." *Id.* at 493-94.

Finally, we also discerned error in the circuit court's balancing of Jocelyn's and Joshua's respective interests. To start, regarding the first *Rooks* factor, we noted that the

20

circuit court did not elaborate on its finding that the parties "were on an equal footing" despite the fact that Jocelyn desired to use the pre-embryo, an interest which the *Rooks* court found to be weightier than mere donation. *Id.* at 495 (citing *Rooks*, 429 P.3d at 593). With respect to the second *Rooks* factor, we considered the circuit court's focus on Jocelyn's physical ability to go through the IVF process again to be misplaced and emphasized that the correct inquiry is not whether pregnancy through other means is theoretically possible, but whether it is "reasonable in the particular circumstances of the case." *Id.* Finally, on the third *Rooks* factor, we noted that the circuit court had seemingly discounted Jocelyn's testimony that the parties undertook IVF with the understanding that each pre-embryo would be given a chance at life, a point which bore directly on the parties' original reasons for undergoing IVF. *Id.* at 496.

Due to those errors, we vacated "the judgment of the circuit court and remand[ed] the case for the court to consider whether a prior oral agreement resolves the parties['] dispute and, if necessary, balance the interests of the parties in accordance with the factors and qualifications outlined in this opinion." *Id.*

### Post-Remand Hearing

Following remand, on August 10, 2021, the circuit court ordered the parties to file supplemental briefing on the issues identified in *Jocelyn I* and provide any further evidence within 30 days. The parties submitted their post-remand briefs and a hearing was held on February 7, 2022.

Jocelyn testified first. Corresponding with her testimony in the first evidentiary hearing, Jocelyn explained that she and Joshua only turned to assisted reproduction after two years of trying natural conception proved fruitless. She noted that the parties were "very hesitant to go forward with IVF, just because we felt that going that far was kind of giving someone else the ability to play God with our children." Thus, the couple opted for IUI initially because it was more natural "conception inside of your body where they increase your ovulation[.]" However, after three unsuccessful IUI procedures at Shady Grove, Jocelyn and Joshua turned to FCM for additional testing. The parties opted for four more rounds of IUI with FCM, all of which were unsuccessful.

Jocelyn also described the physical and emotional toll that the unsuccessful IUI procedures took on her. She described that "I gained weight, some of my hair was thinning and falling out, and [there was] a huge emotional toll with the ups and downs of the hormones." She reiterated her earlier testimony regarding the hormone injections that she was forced to stop working full-time. Jocelyn summarized: "I gave up my career and my time and put everything I had into this."

Jocelyn explained that the parties opted to pursue IVF despite their beliefs that "every life is sacred[.]" Before doing so, though, the couple made sure that FCM would "let the egg and the sperm take its course, and they will only discard it after th[e] embryo stop[s] developing and there [is] no other chance at life." She emphasized that in her conversations with Joshua, they agreed that "bringing another life into the world was so valuable that we were gonna go through it anyway, only with the understanding that every

life we created was going to be given the chance to be born[.]" She noted that "we agreed that IVF was, in fact, creating life, and that if we were going to go ahead and do this IVF procedure, that no matter what, we would give every embryo the chance to be used."

Jocelyn also described how that view was communicated in the couple's contemporaneous conversations with FCM. She observed that the parties explicitly told FCM that their embryos were not to be used for "quality control and training purposes" because "we wanted to protect the sanctity of life[.]" When discussing disposition upon the death or incompetence of either party, Jocelyn emphasized that "[o]ne of the options was to destroy, which was absolutely out of the question" and that the parties chose the second option, that "the other party would have the sole right to use the embryo[.]" She explained that they did so because of their discussion that "no matter what, our embryos would be used" and that "in the event that anything happened to either one of us, no matter what, the other person would then be responsible for that life that we created[.]"

Finally, Jocelyn noted that, from the commencement of her IVF treatments up until the first evidentiary hearing following their separation, Joshua had consistently stated that he did not want the parties' remaining pre-embryo to be destroyed, even going so far as having "[s]pecifically gone to the fertility center and ask[ing] them to not destroy it[.]" She claimed that, in May of 2019, after the parties were separated, Joshua then expressed a desire to donate the pre-embryos in case of disagreement. She said that in a meeting where the parties' discussed settlement terms for the divorce proceedings, Joshua stated that his preferences as to the pre-embryo were "I don't care as long as you don't have it, but I don't ever want it to be destroyed. I want it to be donated." She also emphasized that Joshua

23

had never placed any limitations on the parties' understanding that the pre-embryos would be used "no matter what" and noted that "the contract even reviewed the absolute extremes [of] death or mental incapacity" with the decision that "we would use them all to establish a pregnancy or attempt to give every embryo a chance at life." She testified that there "was never any caveat placed on that use."

### Dr. Katherine Bass

Dr. Bass, Jocelyn's and Joshua's physician at FCM, testified next. Dr. Bass explained that Jocelyn was diagnosed with "primary infertility[,]" a designation which simply "means that the couple has never been pregnant before." She clarified that Jocelyn did retain the ability to produce eggs, but that her likelihood of success was severely lower if she were to start the IVF process from the beginning. Dr. Bass explained that, given Jocelyn's age of 41-and-a-half at the time of the hearing, "were she to start IVF now, her chances of having a live birth would be 7.9 percent" based on National IVF summary statistics. She further described that the chances of success depend on the "age of the egg at the time the embryo was frozen[,]" meaning that Jocelyn's chances of a live birth using the frozen pre-embryo initially retrieved in 2015 would be approximately 25.7%.

### Joshua

Lastly, Joshua testified and noted that Jocelyn had accurately described his religious beliefs "[t]o an extent" but that there were "some other aspects that I would disagree with[.]" He conceded that he and Jocelyn had agreed to give all the embryos "a chance at life." Nonetheless, he emphasized that the parties had never discussed the possibility of divorce before opting to proceed with IVF. Joshua also clarified that his current preference

was for the embryos to be discarded "[b]ecause the marriage and relationship has been dissolved[.]" Contrary to Jocelyn's testimony, he claimed he never requested that the fertility center not destroy the pre-embryo and instead "went there to ensure that Jocelyn would not be able to use it[.]" Following Joshua's brief testimony, the parties delivered closing arguments to the circuit court and the matter was taken under advisement.

## Award to Joshua

In a written opinion and order entered June 1, 2022, the circuit court awarded the parties' remaining pre-embryo to Joshua.

First, the court found that there was uncontroverted testimony that "the parties agreed to give every single embryo they created the opportunity of life" and that "there was no discussion about what might happen to the pre-embryos if the parties divorced." Accordingly, while acknowledging the existence of an agreement between the parties, the circuit court emphasized that "[t]his agreement was at a time when the parties were still married and living together." Thus, Jocelyn and Joshua's agreement "to give the opportunity of life to every pre-embryo they created contemplated the parties' being married and having and raising children together." The circuit court therefore concluded that there was "no meeting of the minds or agreement as to disposition of their pre-embryo(s), if any, in the event of the parties' divorce."

Next, the circuit court proceeded to balance the parties' interests pursuant to the *Rooks* factors. On the first factor, the court found that Jocelyn "intends to become the genetic parent herself." On the second factor, the court found that "[t]he evidence sufficiently establishes that [Jocelyn] has no other reasonable means of achieving genetic

parenthood other than through IVF" given her age and the "substantial physical and emotional toll" of IVF. With respect to the third factor, the court found that "[t]he parties' original reason to pursue IVF was to achieve their goal of having a family and having children jointly as a married couple." Finally, regarding the fourth, fifth, and sixth factors, the court reiterated its prior findings that "adding another child to an already complicated situation would constitute additional emotional, financial, and logistical hardship" for Joshua; that "there is no evidence of bad faith" by either party; and that "[t]here are no other considerations relevant to the parties' unique situation."

Ultimately, the court ruled as follows:

> I have engaged in a balancing of the interests of the parties in accordance with the factors and qualifications outlined in the [Appellate Court of Maryland's] Opinion. The parties have substantial competing interests in their pre-embryo. Plaintiff has a substantial interest in preserving the pre-embryo for implantation to achieve pregnancy. Defendant has a substantial interest in avoiding forced parenthood. In weighing the parties' respective competing interests in light of their original reason to pursue IVF, i.e., to achieve their goal of having a family and having children jointly as a married couple, I conclude that the pre-embryo should be awarded to [Joshua].

Jocelyn noted a timely appeal from the circuit court's order.[7]

---

[7] In *Jocelyn I*, we concluded that "'pre[-]embryos are not, strictly speaking, either 'persons' or 'property,' but occupy an interim category that entitles them to special respect because of their potential for human life,'" *Jocelyn I*, 250 Md. App. at 468 (quoting *Davis*, 842 S.W.2d at 597). Although the pre-embryo in this case does not fit squarely under the marital property, alimony or custody constructs of our statutory and decisional law governing family law cases, we treat the underlying Memorandum and Order dated June 1, 2022, as a custody order. We exercise jurisdiction under CJP § 12-303 because the appellant asserts that the underlying order "deprived [her] . . . of the care and custody of" her child. To be clear, we are not deciding or asserting the personhood status of the pre-

(Continued)

26

On June 26, 2023, this Court reversed the circuit court's ruling in an unreported opinion on the ground that an enforceable oral agreement had been formed between the parties that mandated an award of the parties' remaining pre-embryo to Jocelyn. *Jocelyn P. v. Joshua P.*, No. 561, Sept. Term 2022, slip op. at 34-43 (filed June 26, 2023). On July 20, 2023, and pursuant to Maryland Rule 8-605.1(b), Jocelyn filed a request that this Court designate the opinion for reporting. We stayed the issuance of our mandate pending our resolution of that request. Less than one week later, before the mandate issued, Joshua filed a Petition for Certiorari in the Supreme Court of Maryland. We grant Jocelyn's request for reporting, and, because the mandate has not issued, we take the opportunity to further clarify the trial court's authority in Section E, "Proceedings on Remand."

## DISCUSSION

### I.

### Oral Agreement

#### *Standard of Review*

Generally, "[t]he interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law[,]" which this Court reviews *de novo*. *Impac Mortg. Holdings, Inc. v. Timm*, 474 Md. 495, 533 (2021); *Ocean Petrol. Co., Inc. v. Yanek*, 416 Md. 74, 86 (2010). In doing so, we apply the objective theory of contract interpretation, the primary goal of which is "to ascertain the intent of the parties

---

embryo, but because appellant believes the pre-embryo is her child and asserts that the underlying order deprives her of the ability to give birth to her child, we exercise jurisdiction over this order in this extraordinary case in which time is of the essence.

27

in entering the agreement and to interpret 'the contract in a manner consistent with [that] intent.'" *Credible Behav. Health, Inc. v. Johnson*, 466 Md. 380, 393 (2019) (quoting *Ocean Petroleum Co.*, 416 Md. at 88).

## A. *Parties' Contentions*

Jocelyn contends that the parties' oral agreement was to "give every embryo a chance at life, *no matter what*[,]" an understanding not limited to the parties being married and raising children together. (Emphasis in original). She points out that the parties further solidified that understanding by agreeing that "if anything happened to either one of them, no matter what, the other would be responsible for giving the life that they had created the opportunity to be born." She emphasizes that the parties opted to continue with IVF even when fourteen pre-embryos were produced and that neither party ever placed any limitations on their understanding that each pre-embryo would be given a chance to be born. Jocelyn thus argues that "[a]llowing [Joshua] to reconsider the terms of that agreement now is tantamount to allowing [Joshua] to back out of a contract or granting a back-door approach to the contemporaneous mutual consent theory already rejected by this Court[.]"

Joshua responds that "there was absolutely no discussion between the parties whatsoever regarding what would become of the embryos if they, as a couple, separated or divorced." He emphasizes that the testimony at the post-remand hearing established only that "the parties, when married and contemplating building a family, agreed to give each embryo they produced a chance at life." He contends that "[t]o bind the parties to this as a contract, effectively binds [Joshua] to 'perform a contract [which] he did not intend to

28

make [or which he] would not have entered into had its true effect been understood.'" (quoting *4500 Suitland Road Corp. v. Ciccarello*, 269 Md. 444, 452 (1973)).

## B. *Oral Agreements under Maryland Law*

When interpretation of an oral agreement is at issue, the Supreme Court of Maryland has explained:

> The construction of an oral contract, whose terms are undisputed, like that of a written contract, is a matter for the Court to whom the law confides the interpretation of all contracts, but where the fact as to what were the terms or provisions of an oral contract is in dispute, and the testimony on the subject is conflicting, it should be left to the jury, not to construe the contract, but to find what it in fact was.

*Marr v. Langhoff*, 322 Md. 657, 667 (1991) (quoting *Am. Towing & Lightering Co. v. Baker-Whitely Coal Co.*, 111 Md. 504, 522 (1909). If "'there is some conflict in the testimony as to just what language was used by the contracting parties in making an oral contract, the construction placed upon the terms and conditions of the contract by the parties themselves may be shown and is important.'" *Ramlall v. MobilePro Corp.*, 202 Md. App. 20, 39 (2011) (quoting *Serv. Realty Co. v. Luntz*, 210 Md. 228, 235 (1956)). Moreover, "when parties disagree as to the existence or terms of an oral agreement, their conduct and intentions may be employed to determine any ambiguous and unknown provisions of the contract." *Braude v. Robb*, 255 Md. App. 383, 400-01 (2022) (quoting *Son v. Margolius, Mallios, Davis, Rider & Tomar*, 114 Md. App. 190, 213 (1997), *rev'd in part on other grounds*, 349 Md. 441 (1998)). Of course, a contract "whether written or verbal," must not be "vague or uncertain in its essential terms" and the parties "must express themselves in such terms that it can be ascertained to a reasonable degree of

29

certainty what they mean." *Mogavero v. Silverstein*, 142 Md. App. 259, 272 (2002) (quoting *Robinson v. Gardiner*, 196 Md. 213, 217 (1950)).

In the instant case, Joshua asserts that no oral agreement was formed between himself and Jocelyn because their conversations were vague and failed to delineate the parties' obligations in a sufficiently definite manner. Although we have declined to recognize alleged oral agreements that did not definitively express the parties' intentions and obligations, *see, e.g.*, *Mogavero*, 142 Md. App. at 271-72, here, the terms of the oral agreement, and the consideration in support of that agreement, are clear. It was only after exhausting all other options that Joshua and Jocelyn turned to IVF. Importantly, both parties testified that they had agreed to undergo IVF *only* if they gave "all the embryos a chance at life." The parties held this understanding both before *and* after an August 25, 2015 meeting with Dr. Bass during which she gave the parties copies of FCM's consent forms and financial policies, and explained "in detail" the IVF process, all relevant risks attendant to the procedure, as well as "embryo transfer and the way embryos are handled in the lab."

Joshua admitted during his testimony that he and Jocelyn "agree[d] to give all the embryos a chance at life[,]" and he did not rebut Jocelyn's testimony that they would do so "no matter what[.]" The actions that the parties took subsequent to forming their agreement confirmed their understanding that each pre-embryo should be given a chance at life. *Braude*, 255 Md. App. at 400-01 ("when parties disagree as to the existence or terms of an oral agreement, their conduct and intentions may be employed to determine any ambiguous and unknown provisions of the contract.") (citation omitted). For instance,

30

Joshua and Jocelyn signed the FCM Agreement, and at each opportunity presented therein, communicated their firm understanding to FCM that their pre-embryos were to be given a chance at life, even in the event of one party's death or incapacity. Moreover, the parties' Agreement with FCM provided that they did not consent "to allow the clinic to utilize [their] abnormal embryos for quality control and training purposes" and they would instead be "discarded in accordance with normal laboratory procedures." Jocelyn explained that this was in accordance with their view that the embryos would only be discarded if they were not fertilized successfully and they checked that option "because we wanted to protect the sanctity of life and the dignity of our own children that we created."

Overall, the evidentiary record demonstrates that, before the trial court, the parties agreed to the basic terms of their oral agreement, but disagreed on their intent, and therefore, the interpretation of the terms. Accordingly, because the essential terms of the oral agreement are not in dispute, the question before this Court is a question of law that we review without deference to the trial court. *See Ramlall*, 202 Md. App. at 38-39 ("'The construction of an undisputed oral contract is for the court to decide as a matter of law.'" (quoting *Marr*, 322 Md. at 667)); *Credible Behav. Health v. Johnson*, 466 Md. 380, 392 (2019) ("'[T]he interpretation of a contract, including the question of whether the language of a contract is ambiguous, is a question of law subject to *de novo* review.'" (quoting *Myers v. Kayhoe*, 391 Md. 188, 198 (2006)). Before applying these principles to the agreement at issue in this appeal, we turn to consider how other states have interpreted agreements concerning pre-embryo disposition in this emerging area of the law.

### C. *Agreements Concerning Pre-Embryo Disposition*

As with any agreement, a contract between the progenitors of pre-embryos must be supported by "an offer and acceptance of definite terms." *Bilbao v. Goodwin*, 217 A.3d 977, 988 (Conn. 2019). As between the progenitors, the offer and acceptance often takes the form of mutual promises enabling "the opportunity to create pre-embryos by contributing gametic material[.]" *Id.* at 989. When validly formed, "[a]greements between progenitors, or gamete donors, regarding disposition of their pre-zygotes should generally be presumed valid and binding, and enforced in any dispute between them[.]" *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998). Doing so avoids costly litigation and provides "the certainty needed for effective operation of IVF programs[.]" *Id.* However, in interpreting such agreements, courts should be careful to "honor the parties' expressions of choice, made before disputes erupt" because "[a]dvance agreements as to disposition would have little purpose if they were enforceable only in the event the parties continued to agree." *Id.*

The contractual approach promotes flexibility and allows the parties to think through their preferences before they are in the throes of an emotional divorce proceeding. In doing so, the contractual approach also provides a measure of certainty to the parties as, unlike the contemporaneous mutual consent approach, it prevents one party from

exercising a *de facto* veto power over any prior agreement upon which the parties relied before undergoing the IVF process.[8]

Most of the cases decided by our sister states addressing the enforceability of an agreement between the progenitors have concerned written contracts between the progenitors and an IVF clinic. For example, in *Bilbao*, the parties signed a consent form provided by their IVF center which included "four checkbox options relative to divorce: leave the pre-embryos to the female party, to the male party, to a third-party designee of their choice, or have them 'discarded according to American Society for Reproductive Medicine Ethical Guidelines.'" 217 A.3d at 981. The parties chose the option of discarding the pre-embryos, "which they manifested by checking the appropriate box, initialing that selection, and signing the agreement in full on the next page." *Id.* The Supreme Court of Connecticut held this to be an enforceable agreement, emphasizing that it was supported by a mutual exchange of promises between the three parties to the agreement. *Id.* at 989-90. Accordingly, the Court remanded the case and directed the trial court to order the disposition of the pre-embryos as dictated by the parties' advance agreement. *Id.* at 992; *accord Kass*, 696 N.E.2d at 181 (finding the parties' assent to the plain terms of their

___

[8] As one commentator has recently observed, the contractual approach "puts [] flexibility in the hands of the parties who can decide what is most important to them when their judgment is not clouded by disagreement and animosity towards the party they are litigating against." Allyson Wade, Note and Comment, *Using Contract Law to Resolve Frozen Pre-Embryo Disputes*, 81 MD. L. REV. 1049, 1068 (2022). Especially as compared to the contemporaneous mutual consent approach, that understanding also promotes certainty because otherwise a "party who depends on fertility treatments and family planning to achieve biological parenthood has no ability to structure their family in a reliable way, as the other party can change their mind and thwart those plans at any time." *Id.* at 1066.

agreement "unequivocally manifest[s] their mutual intention that in the present circumstances [of divorce] the pre-zygotes be donated for research to the IVF program.").

Similarly, the Oregon Court of Appeals enforced what it considered to be the unambiguous terms of a storage agreement signed by the parties in *In re Marriage of Dahl and Angle*. 194 P.3d 834 (Or. Ct. App. 2008). There, the husband and wife were provided with the option of designating one spouse "to have sole and exclusive right to authorize and direct [the laboratory] to transfer or dispose of the Embryos" if they were "unable or unwilling to execute a joint authorization[.]" *Id.* at 836 (emphasis removed). The couple did so and designated the wife as the individual with authority to direct the disposition of the pre-embryos in the event they were unable to come to an agreement. *Id.* The trial court held that the plain terms of the agreement controlled and the Oregon Court of Appeals affirmed, reasoning that "the parties contemplated the contingency of their not being able to reach agreement on the disposition of the embryos, and they selected wife to be the primary decision maker in that regard." *Id.* at 841. Thus, because the wife desired for the pre-embryos to be discarded, the trial court did not abuse its discretion in simply giving effect to the parties' agreement. *Id.* at 841-42.

In *Roman v. Roman*, the Court of Appeals of Texas likewise held the parties to the plain terms of their prior agreement. 193 S.W.3d 40 (Tex. Ct. App. 2006). There, before commencing with IVF, Augusta and Randy signed a consent form which provided that "[i]f we are divorced or either of us files for divorce while *any of our frozen embryos are still in the program,* we hereby authorize and direct, jointly and individually, that one of the following actions be taken: The frozen embryo(s) shall be . . . Discarded." *Id.* at 52

34

(emphasis in original). Despite that language, the trial court awarded the parties' frozen embryos to Augusta to use for implantation. *Id.* at 43-44. The Court of Appeals of Texas reversed, emphasizing that "agreement's language could not be clearer" in directing the parties' remaining embryos to be discarded upon their divorce. *Id.* at 52. Although Augusta claimed that she and Randy had never actually discussed the possibility of divorce, the court observed that "she was aware of and understood the significance of her decision" and the agreement "was not ambiguous so as to preclude a meeting of the minds." *Id.* at 53. Thus, in "awarding the frozen embryos to Augusta, the trial court improperly rewrote the parties' agreement instead of enforcing what the parties had voluntarily decided in the event of divorce." *Id.* at 55.

In one case, the Appellate Court of Illinois confronted the question of whether a prior oral agreement between the parties controlled the disposition of their pre-embryos. We regard *Szafranski v. Dunston*, 34 N.E.3d 1132 (Ill. App. Ct. 2015) (*Szafranski II*), therefore, to be the most germane among the foreign cases concerning pre-embryo dispositions. In *Szafranski II*, Karla and Jacob—who were dating at the time—agreed to pursue IVF to preserve Karla's ability to have children after she had been diagnosed with lymphoma and was expected to suffer from ovarian failure after undergoing chemotherapy. *Id.* at 1137-38. After meeting with staff at Northwestern Hospital and signing a consent form, three eggs were fertilized using Jacob's sperm. *Id.* at 1136, 1139-40. The parties' relationship ended thereafter and Jacob sought to enjoin Karla from using the parties' jointly produced pre-embryos without his consent. *Szafranski II*, 34 N.E.3d at 1136, 1140-41. After a two-day trial, the trial court awarded the pre-embryos to Karla on the basis of

the parties' prior oral agreement and the Appellate Court of Illinois affirmed. *Id.* at 1146-47, 1164.

On appeal, Jacob did not challenge the trial court's finding that "an oral contract was created on March 24 when Karla asked him if he would be willing to donate his sperm to create pre-embryos with her, and he manifested his acceptance of Karla's offer[.]" *Id.* at 1148. Rather Jacob asserted that "he never agreed, on March 24, that Karla could use the pre-embryos without his consent" because the parties "never even discussed or contemplated" the disposition of the pre-embryos in the future. *Id.* at 1149. Karla, in turn, asserted that the parties' agreement "did not include any limitation on her use of the pre-embryos[.]" *Id.*

The appellate court held that the parties' prior oral agreement unambiguously conferred on Karla the right to use the pre-embryos without limitation. The court pointed out that, according to his own testimony, Jacob "never communicated a desire to have any say in Karla's future disposition of the pre-embryos[.]" *Id.* Indeed, the court noted that there were at least four "instances where Jacob could have voiced his alleged desire about wanting a right to consent to Karla's use of the pre-embryos and, nevertheless, remained silent on the issue." *Id.* at 1150. That being so, the court emphasized that it could not accept the view that "any unexpressed contingency related to the storage or use of the cryopreserved pre-embryos would be subject to Jacob's prior consent simply because he and Karla did not discuss it when they decided to undergo IVF." *Szafranski II*, 34 N.E.3d at 1151. The court reasoned that "would allow Jacob to limit Karla's use of the pre-embryos each time a previously unidentified circumstance or contingency arose" and

36

would incorporate "a limitation into the oral contract [that] would change the fundamental essence" of the agreement. *Id.* at 1151. Thus, the court affirmed the trial court's holding that the oral contract did not provide any limitations on Karla's use of the pre-embryos in dispute. *Id.* at 1152-53.

## D. *Analysis*

As we explained in *Jocelyn I*, the parties' written contract with FCM does not control the disposition of the parties' pre-embryo because it did not manifest the progenitors' intent and, in fact, stipulated that "if any dispute arises between the two regarding disposition of the embryos" FCM was authorized, in its sole discretion to "refrain from taking any action unless and until otherwise directed by a final judgment of a court of competent jurisdiction or by another agreement signed by both partners." *Jocelyn I*, 250 Md. App. at 493, 450. The only question before us is thus whether the oral agreement between the parties, as attested to by both parties, "controls the outcome in this case." *Id.* at 493-94. The circuit court found that it did not because Jocelyn and Joshua's "agreement to give the opportunity of life to every pre-embryo they created contemplated the parties' being married and having and raising children together[,]" and therefore, there was "no meeting of the minds or agreement as to disposition of their pre-embryo(s), if any, in the event of the parties' divorce." We disagree.

At the hearing below, Jocelyn testified that the parties formed an oral agreement before pursuing IVF "that IVF was, in fact, creating life, and that if we were going to go ahead and do this IVF procedure, that *no matter what*, we would give every embryo the chance to be used." (Emphasis added). Joshua, after hearing Jocelyn's testimony, directly

37

acknowledged that the parties "agree[d] to give all the embryos a chance at life" and did not refute Jocelyn's testimony that they agreed to do so "no matter what[.]" Based on their agreement to undergo IVF with the understanding that each pre-embryo would be used, both Jocelyn and Joshua provided their respective gametic materials, thereby providing sufficient consideration. *See Shimp v. Shimp*, 287 Md. 372, 386 (1980) ("[M]utual promises in each of which the promisor undertakes some act or forbearance that will be, or apparently may be detrimental to the promisor or beneficial to the promisee, and neither of which is rendered void by any rule of law other than that relating to consideration, are sufficient consideration for one another." (quoting *Hercules Powder Co. v. Campbell*, 156 Md. 346, 364-65 (1929))). Jocelyn provided additional consideration insofar as she endured significant physical side effects and donated so much time to the effort that she had to shift away from full-time work. Accordingly, the evidence here establishes that the parties formed an enforceable agreement.

Next, we must determine the terms of that agreement. In the case of an oral contract, the terms of the agreement "may be verified from testimony, the conduct of the parties, and other evidence in the case." *Kramer v. Kramer*, 26 Md. App. 620, 626-27 (1975) (enforcing an oral contract for agreed-upon sum of child support based on unrefuted testimony) *superseded on other grounds as recognized in Gates v. Gates*, 83 Md. App. 661, 666 (1990). In *Kramer*, for example, the terms of an oral contract to pay child support were verified through the testimony of the mother, who explained that the parties agreed the father would pay support in the amount of $150.00 every two weeks. *Id.* at 626. Father, for his part, "at no time during the trial denied the existence of an agreement with respect

38

to child support as testified to by the mother." *Id.* At one point during the trial he "testified that from the time of the separation of the parties in August, 1967, he paid $150.00 every two weeks for the three children[.]" *Id.* Here, as in *Kramer*, the unrefuted testimony of Jocelyn—as well as Joshua's direct acknowledgement that the parties "agree[d] to give all the embryos a chance at life"—establishes that the parties agreed to undergo IVF with the clear understanding that "*no matter what*, [they] would give every embryo the chance to be used." (Emphasis added). We agree with the reasoning in *Szafranski II*, that allowing Joshua the ability to limit Jocelyn's use of the pre-embryo **"**each time a previously unidentified circumstance or contingency arose" would incorporate "a limitation into the oral contract [that] would change the fundamental essence" of the agreement. 34 N.E.2d at 1151.

Because the essential terms of the parties' agreement are undisputed, the construction of those terms is a question of law. *See Ramlall*, 202 Md. App. at 38-39 ("The construction of an undisputed oral contract is for the court to decide as a matter of law."). In essence, the parties attach different constructions to their agreement that they would "give all of the embryos a chance at life" "no matter what." Joshua, for example, effectively interprets it to mean "no matter what *except* in the event of divorce." Jocelyn, on the other hand, construes it as meaning "no matter what" *including* the contingency of divorce. In giving effect to the parties' agreement, under the objective theory of contracts, we consider "what a reasonable person in the position of the parties would have meant at the time [the oral agreement] was effectuated." *Marr*, 322 Md. at 667 (quoting *Herget v. Herget*, 319 Md. 466, 470 (1990)). Frankly, we see no reason why an agreement to "give

all of the embryos a chance at life" "no matter what" would not, viewing the terms objectively, encompass the contingency of divorce. It is difficult to imagine language more clear or uncompromising in scope. Even if the parties subjectively contemplated that they would use their jointly produced pre-embryos within the context of an intact marriage, the "'language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract.'" *W.F. Gebhardt & Co. v. Am. Eur. Ins. Co.*, 250 Md. App. 652, 666 (2021) (quoting *Md. Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 695 (2015)).

Moreover, we observe that the parties' subsequent discussions with FCM confirm that their agreement to use each pre-embryo was not strictly limited to the context of an intact family unit, as Joshua now contends.[9] *Kramer*, 26 Md. App. at 626-27 (an oral agreement "may be verified from testimony, the conduct of the parties, and other evidence

---

[9] We recognize that the parties' discussions and subsequent agreement with FCM constitute, in a sense, extrinsic evidence beyond their initial oral agreement to give each pre-embryo a chance at life. Nonetheless, we observe that the parol evidence rule does not bar our consideration of those additional indicia of the parties' understanding because the rule "prohibits the admission of evidence of *prior or contemporaneous* oral agreements, or *prior* written agreements, whose effect is to add to, vary, modify, or contradict the terms of a *writing* which the parties intend to be a final, complete, and exclusive statement of their agreement." 11 WILLISTON ON CONTRACTS § 33:1 (4th Ed., May 2023 Update) (emphasis added). It is also true, of course, that we may consider extrinsic evidence in interpreting the terms of an agreement only when those terms are sufficiently ambiguous. *Credible Behav. Health, Inc. v. Johnson*, 466 Md. 380, 394 (2019). Yet, we always consider the language of an agreement "in context" with particular reference to "'the contract's character, purpose, and the facts and circumstances of the parties at the time of execution.'" *Id.* (quoting *Ocean Petrol. Co. v. Yanek*, 416 Md. 74, 88 (2010)). As we explain above, we consider this extrinsic evidence only in response to Joshua's argument that the agreement to "give all of the embryos a chance at life" "no matter what" was limited to the parties' understanding that they would be raising children together.

in the case."); s*ee also Braude v. Robb*, 255 Md. App. 383, 401-02 (2022) ("'[W]hen parties disagree as to the existence or terms of an oral agreement, their conduct and intentions may be employed to determine any ambiguous and unknown provisions of the contract.'") (quoting *Son v. Margolius, Mallios, Davis, Rider & Tomar*, 114 Md. App. 190, 213 (1997), *rev'd in part on other grounds*, 349 Md. 441 (1998)). Indeed, Jocelyn described how the couple consistently communicated their mutual understanding to FCM before commencing with the process. She observed that the parties told FCM explicitly that their pre-embryos were not to be used for "quality control and training purposes" because "we wanted to protect the sanctity of life[.]" Jocelyn emphasized that upon the death or incompetence of either party, that "[o]ne of the options was to destroy, which was absolutely out of the question" and that the parties chose the second option, as reflected in the FCM Contract, that "the other party would have the sole right to use the embryo[.]" She explained that they did so because of their discussion that "no matter what, our embryos would be used" and that "in the event that anything happened to either one of us, no matter what, the other person would then be responsible for that life that we created[.]"[10]

---

[10] We underscore that, in our objective interpretation of the oral agreement, including the term "no matter what," we consider "what a reasonable person in the position of the parties would have meant at the time [the oral agreement] was effectuated." *Marr v. Langhoff*, 322 Md. 657, 667 (1991). One can construct endless "what if" scenarios, but the question is, "what is reasonable?" At oral argument, Joshua's counsel seemed to suggest that any award of the pre-embryo to Jocelyn would create a slippery slope potentially culminating in any offhand marital conversation becoming an enforceable contract and even forced pregnancy if the roles were reversed—*i.e.*, if the male desired use of the pre-embryo, but the female did not. We do not agree. This argument does not recognize that the options before the court are to award the pre-embryo either to Father or

(Continued)

41

The circuit court based its interpretation on the premise that the parties' agreement was confined to "being married and having and raising children together" on the undisputed point that the parties had not discussed the possibility of divorce before pursing IVF. We hold that the court's interpretation is contrary to the plain terms of the agreement. As previously noted, we find the Appellate Court of Illinois's ruling in *Szafranski v. Dunston*, 34 N.E.3d 1132 (Ill. App. Ct. 2015) (*Szafranski II*) helpful in our analysis. There, Jacob argued that the parties' agreement did not provide that "Karla could use the pre-embryos without his consent" because the parties "never even discussed or contemplated" the disposition of their pre-embryos in the future. *Szafranski II*, 34 N.E.3d at 1149. The

---

to Mother. If the roles were reversed, as counsel suggests, and there was an enforceable agreement to "give all of the embryos a chance at life, no matter what," then the court could award the pre-embryo to Father as the party seeking to give the pre-embryo a chance at life. In that case, he would most likely have to find a surrogate, or he could donate the embryo to another couple. To suggest that enforcing such a promise could lead to courts ordering women to undergo forced pregnancies conjures an overstated parade of horribles. It would be just as unrealistic to suggest that protecting a woman's choice to terminate a pregnancy could lead to orders forcing women to terminate pregnancies against their will. These hypotheticals fail to take into account clearly established public policy. *Cf. Dingle v. Belin*, 358 Md. 354, 369 (2000) ("[T]he decision to undergo an elective medical procedure rests with the patient, who, if competent, retains the right to exercise control over his or her body"); *Sard v. Hardy*, 281 Md. 432, 439 (1977) ("(e)very human being of adult years and sound mind has a right to determine what shall be done with his own body.") (quoting *Schloendorff v. Socy. N.Y. Hosp.*, 105 N.E.2d 92, 93 (N.Y. 1914) (Cardozo, J.), *overruled on other grounds by Bing v. Thunig*, 143 N.E.2d 3 (N.Y. 1957)); *Mack v. Mack*, 329 Md. 188, 210-11 (1993) (providing that, as a corollary to the doctrine of informed consent, there exists a "Maryland common-law right of a competent adult to refuse treatment."). Moreover, under Maryland law, the ultimate decision whether to terminate or carry a pregnancy to term is entrusted solely to the woman when a pregnancy has been established. *See* Maryland Code (1982, 2019 Repl. Vol, 2021 Supp.) Health General Article ("HG"), Section 20-209(b) ("Except as otherwise provided in this subtitle, the State may not interfere with the decision of a *woman* to terminate a pregnancy[.]" (emphasis added)).

appellate court rejected that line of argument, reasoning that Jacob's view would enable him "to limit Karla's use of the pre-embryos each time a previously unidentified circumstance or contingency arose" and would incorporate "a limitation into the oral contract [which] would change the fundamental essence" of the agreement. *Id.* at 1151. Because Jacob agreed to provide his sperm without any contemporaneously communicated conditions, the court determined that his silence could not be interpreted as reserving a *de facto* veto power when it came time for Karla to actually use the pre-embryos.

We deem the present case to be analogous to *Szafranski II* insofar as Joshua also seeks to introduce a limitation into the parties' oral agreement to which they never actually agreed. Again, we observe that Jocelyn testified that the parties formed an oral agreement "that *no matter what*, we would give every embryo the chance to be used[;]" an agreement so broad that it would naturally encompass the contingency of divorce. (Emphasis added). Joshua heard that testimony and testified himself that the parties "agree[d] to give all the embryos a chance at life." He did not refute Jocelyn's repeated testimony that the agreement applied "no matter what." Instead, he testified to his interpretation of what "no matter what" meant. According to Joshua, because the parties never discussed divorce, the agreement was really that every pre-embryo would be given a chance at life *except in the event of divorce*. But under the objective theory of contracts, we consider "what a reasonable person in the position of the parties would have meant at the time [the oral agreement] was effectuated." *Marr*, 322 Md. at 667. We do not discern an agreement to "give all of the embryos a chance at life" "no matter what" to encompass the limitation that

43

the agreement apply only to the circumstance that the parties are "married and having and raising children together."

Although we are not unsympathetic to Joshua's position, the fact that he now regrets entering into the parties' oral agreement does not justify departing from its clear terms. At bottom, Jocelyn and Joshua agreed to provide their gametic material with the firm understanding that every single one of their pre-embryos would be used. They certainly did so for the purpose of starting a family together, but no limitations were placed on their agreement to give each pre-embryo a chance at life; and the circuit court erred by imputing such a limitation based on the silence of the parties about what would happen in the event of divorce. That is especially true where the limitation imposed is contradicted by the parties' express intention to give the pre-embryos a chance at life when they are no longer "having and raising children together" due to one party predeceasing the other.

Finally, we note that Jocelyn makes an astute point in asserting that allowing Joshua to rewrite the terms of their prior agreement would come close to "granting a back-door approach to the contemporaneous mutual consent theory already rejected by this Court[.]" As we explained in *Jocelyn I*, the contemporaneous mutual consent approach enables each of the progenitors to "'change his or her mind about disposition up to the point of use or destruction of any stored embryo,' *regardless of any prior agreement.*" *Jocelyn I*, 250 Md. App. at 476-77 (quoting *Witten*, 672 N.W.2d at 782) (emphasis added). Here, Joshua effectively seeks to impose a condition on the parties' prior agreement to give each pre-embryo a chance at life and argues that he should not "be bound to this verbal intent" in the event "the parties later divorced and no longer found themselves in a marriage and

44

building a family together[.]"  But Jocelyn's testimony remains unchallenged that she agreed to suffer through the IVF process because the parties had agreed "that *no matter what*, we would give every embryo the chance to be used."  (Emphasis added).  Were we to uphold the trial court's decision, Joshua would be granted post-hoc veto power similar to that provided under the contemporaneous mutual consent approach.  Because we rejected that theory in *Jocelyn I*, we will hold the parties to their prior agreement to use each pre-embryo.

Accordingly, we hold that the trial court erred in finding that the parties' prior oral agreement to give each pre-embryo a chance at life "no matter what" did not control the disposition of Jocelyn and Joshua's remaining pre-embryo.  In the future, to avoid these disputes, we would encourage couples—no matter how hopeful they are as to the future success of their marriage—to "think through [all] possible contingencies and carefully specify their wishes in writing."  *Kass*, 696 N.E.2d at 180.

### E.  *Proceedings on Remand*

Pursuant to Maryland Rule 8-604(e), we maintain the discretion to "enter an appropriate judgment directly or . . . order the lower court to do so" when "reversing or modifying a judgment in whole or in part[.]"  Md. Rule 8-604(e).  Because time is of the essence for Jocelyn, we remand with instructions for the circuit court to enter judgment in Jocelyn's favor and award her the parties' remaining pre-embryo.  We recognize that, because we now reverse the judgment of the circuit court and instruct that the parties' pre-embryo should be awarded to Jocelyn for purposes of achieving pregnancy, the parties' rights and obligations respective to a potential future child shift to the forefront.  Although

45

Jocelyn testified in the first evidentiary hearing that she could "absolutely" be financially responsible for any child and that she wouldn't "have any issues supporting [her]self[,]" the record is not fully developed as to whether the parties had any particular agreement regarding Joshua's potential role and obligations in the event of a successful birth.

We observe that a hearing to determine the parties' rights and obligations to the potential second child that the parties' remaining pre-embryo represents would be premature prior to the child's birth for several reasons. While the parties may agree, as Jocelyn has suggested, to forego any child support and that no other obligations would be imposed on Joshua, any such agreement is not binding on the court precisely because "child support decisions always are within the sound discretion of the circuit court, regardless of any agreement between the child's parents." *Corapcioglu v. Roosevelt*, 170 Md. App. 572, 606 (2006) (citations omitted). To permit otherwise would "elevate[] the parties' contractual expectations over the best interests of the children and impermissibly allow[] the parties 'to agree to preclude a child's right to support by the other parent, or the right to have that support modified in appropriate circumstances.'" *Shrivastava v. Mates*, 93 Md. App. 320, 330 (1992) (quoting *Lieberman v. Lieberman*, 81 Md. App. 575, 588 (1990); *Walsh v. Walsh*, 333 Md. 492, 504 (1994); *Guidash v. Tome*, 211 Md. App. 725, 739-45 (2013). *But see* CYNTHIA CALLAHAN & THOMAS C. RIES, FADER'S MARYLAND FAMILY LAW § 6-4(j) (7th ed. 2021) ("Anecdotally, it is quite common for parents to agree to waive support when there is no involvement of the child support agency. Consent orders to that effect are regularly granted.").

We also note that as a practical matter, Joshua's rights and obligations with respect to any potential second child also hinge on whether he would be considered the child's legal parent. Under Maryland law, the paternity of a child may be determined either "by a statutory action in a paternity proceeding under the Family Law Article or in an equitable action under the Estates & Trusts Article." *Turner v. Whisted*, 327 Md. 106, 112 (1992). Because, as far as we can tell from the record, a final divorce decree has not been entered in this case, we leave it to the court's discretion to conduct further proceedings under the appropriate framework either before the entry of a final divorce decree or, after the entry of such an order, under the court's continuing jurisdiction to address issues of child support and custody. *See* Maryland Code (1957, 2019 Repl. Vol., 2022 Supp.), Family Law Article ("FL"), section 1-201(b)-(c) (providing for continuing equitable jurisdiction over child support, custody, and visitation).

As a general matter, "when paternity is in question for a child born during a marriage, the Estates and Trusts Article applies 'because it presents the more satisfactory and less traumatic means of establishing paternity.'" *Sieglein v. Schmidt*, 224 Md. App. 222, 239 (2015) (cleaned up) (quoting *Ashley v. Mattingly*, 176 Md. App. 38, 58 (2007)), *aff'd* 447 Md. 647 (2016). Importantly—due to operation of the presumption of legal parentage set forth in Maryland Code (1974, 2019 Rep. Vol.), Estates & Trusts Article ("ET"), Section 1-206—in a proceeding under the Estates & Trusts Article, "the presumption of legal parentage [for children born during a marriage] established under ET § 1-206 may only be rebutted after a showing that proceedings to disestablish parentage are in the best interests of the child." *Id.* at 243.

In contrast, "the Paternity Act, codified at FL §§ 5–1001 *et seq.,* is aimed at addressing putative fathers in regard to children born *outside of marriage.*" *Id.* at 239 (emphasis in original). Perhaps to avoid deciding questions of paternity that may be mooted, the Paternity Act establishes that—although a "paternity proceeding under this subtitle may be begun during pregnancy[,]" FL § 5-1006(b)—a trial on the merits "may not be held until *after* the birth of the child who is the subject of the proceeding." FL § 5-1025(a) (emphasis added); *see also* FL § 5-1001(g)(1) ("'Father' means an individual, regardless of gender, whose sperm fertilizes an ovum, *resulting in the birth of a child.*") (emphasis added).

Accordingly, utilizing our authority under Maryland Rule 8-604(e), we shall remand to the circuit court with instructions to: (1) enter an order awarding the parties' remaining pre-embryo to Jocelyn and (2) schedule a supplemental review hearing to determine the parties' rights and obligations to any potential second child at the appropriate time.[11]

---

[11] We observe that some of our sister states have adopted a version of Section 706 of the Uniform Parentage Act (UPA), which provides that, "[i]f a marriage is dissolved *before* placement of eggs, sperm, or embryos, the former spouse is not a parent of the resulting child unless the former spouse consented in a record that if assisted reproduction were to occur after a divorce, the former spouse would be a parent of the child." UNIFORM PARENTAGE ACT § 706(a) (UNIF. L. COMM'N & AM. LAW. INST. 2000) (emphasis added). As noted by a recent article, several of our sister states have adopted the UPA approach providing that a child born from a pregnancy commenced through IVF *after divorce* is not the child of the non-consenting former spouse unless that individual agrees to further involvement. Benjamin C. Carpenter, *Sperm is Still Cheap: Reconsidering the Law's Male-Centric Approach to Embryo Disputes After Thirty Years of Jurisprudence*, 34 YALE L. J. & FEMINISM 1, 56 & n.279 (explaining that fourteen states have adopted statutes effectuating the UPA approach). By providing the non-consenting former spouse the option to retain a parental role, this approach reduces the impingement on that individual's constitutional right to not procreate, at least in the sense of imposing unwanted legal (rather than genetic) parenthood.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**